(Decided 21st February, 1873.)

CHARLOTTE E. TYSON, FANNY H. TYSON and JESSE TYSON, infant children of ISAAC TYSON the 3d, and FANNY H. TYSON, by their next friend, GEORGE W. NORRIS *vs.* JAMES W. TYSON and JESSE TYSON, Executors of ISAAC TYSON, JR.

*When the Jury should be instructed as to the Insufficiency of Evidence—Testamentary capacity—Undue influence—Confidential relations—Burden of Proof upon a Caveat to a Will.*

Whenever the evidence offered, is of such a character, that no rational mind could infer the fact sought to be established by it, it is the duty of the Court, upon application, to instruct the jury, that there is no evidence before them legally sufficient to warrant their finding the fact so attempted to be proved.

A person capable of executing a valid deed or contract, has the legal capacity to execute and acknowledge a will or codicil.

Undue influence to invalidate a will, must be such as to deprive the testator of his free agency, and to subordinate his will to that of another; thus making the testamentary act, not the will of the testator, but that of the person exercising dominion or control over him.

The doctrine of confidential relations, adopted in Courts of Equity in regard to gifts and contracts *inter vivos*, does not apply to a devise or bequest by a parent to a child.

Upon a caveat to a will or codicil, charging the want of testamentary capacity on the part of the testator, and the exercise of undue influence over him in the making of his will, the burden of proof rests upon the caveators.

APPEAL from the Superior Court of Baltimore City.

On the 5th of June, 1871, the appellants filed their petition and caveat in the Orphans' Court of Baltimore city, alleging that the codicils of the 12th of April, 1860, and the 15th of January, 1861, to the will of Isaac Tyson, Jr., dated the 7th of January, 1860, were procured by fraud and undue influence practiced by the appellees upon the testator, when his mental powers were enfeebled from age and ill-health. Issues were prayed to be sent for trial to the Superior Court of Baltimore city. The appellees answered the petition, denying that said codicils were procured of the testator by fraud, imposition or undue influence, and affirming that the testator at the time of executing and acknowledging said codicils, was of sound and disposing mind, and capable of executing a valid deed or contract, and so remained up to the day of his death. The Orphans' Court directed the following issues to be sent to the Superior Court, for trial:

1. Was the codicil dated the 12th of April, 1860, executed by Isaac Tyson, Jr., when he was of sound and disposing mind, and capable of executing a valid deed or contract?

2. Was the said codicil of the 12th of April, 1860, executed by the said Isaac Tyson, Jr., under the influence of suggestions, or importunities or misrepresentations, when his mind, from its diseased or enfeebled state, was unable to resist the same?

3. Was the said codicil of 12th April, 1860, procured by undue influence, fraudulent devices, importunities, misrepresentations, and deceits practiced upon the said Isaac Tyson, Jr., which under the circumstances did not leave him free in the disposition of his estate?

4. The same as No. 1, except that it applied to the codicil dated the 15th of January, 1861.

5. The same as No. 2, except that it applied to the codicil of the 15th of January, 1861.

6. The same as No. 3, except that it applied to the codicil of the 15th of January, 1861.

7. Was the said testator, at any time subsequent to the execution of said codicils of the 12th of April, 1860, and the 15th of January, 1861, or either of them, desirous of altering or cancelling the same, and was he prevented therefrom by management, fraud, undue influence or importunities?

Upon the trial of the foregoing issues, the jury found for the defendants, the caveatees, on each and all of them. The facts of the case are presented with sufficient fulness in the opinion of the Court, and the dissenting opinion of Judge BOWIE.

*Exception.*—Upon all the testimony, the plaintiffs, the caveators, offered five prayers, the first, second, third and fifth of which are substantially set out in the opinion of Judge BOWIE, and the fourth is as follows:

4. If the jury believe the facts above set forth, and that said facts continued at the date of the codicil of the 15th of January, 1861, those facts are evidence from which the jury may find that said codicil was obtained by fraud and undue influence.

The defendants, the caveatees, offered the following prayers:

1. That if the jury shall find from all the evidence in the cause, that the said Isaac Tyson, Jr., made and executed the paper-writing which has been offered in evidence in this cause, dated on the twelfth day of April, 1860, purporting to be a codicil to his last will and testament, as testified to by the witness, John H. B. Latrobe, and that he was, at the time of so doing, of sound and disposing mind, and capable of making a valid deed or

contract; and shall further find from the evidence in the cause, that the said paper-writing, dated on the 12th day of April, in the year 1860, and purporting to be a codicil to his last will and testament, was signed, sealed, published and declared by the said Isaac Tyson, Jr., in the presence of the subscribing witnesses thereto, as and for a codicil to his last will and testament, who, in his presence, signed the same as witnesses thereto, that then the presumption of law is in favor of the validity of said codicil, and that the burden of proof is on the plaintiffs to satisfy the jury, that at the time of so doing, the said Isaac Tyson, Jr., was not of sound and disposing mind, and was not capable of executing a valid deed or contract.

2. That if the jury shall find from the evidence in the cause the making and execution of the paper-writing dated on the twelfth day of April, 1860, purporting to be a codicil to the last will and testament of the said Isaac Tyson, Jr., in the manner set forth in the preceding prayer, that there is no evidence in this cause that the said Isaac Tyson, Jr., was not of sound and disposing mind, and capable of executing a valid deed or contract when he so made and executed the said codicil; and the jury must find for the defendants on the first issue.

3. That there is no evidence in this cause that the said Isaac Tyson, Jr., executed the paper-writing dated on the twelfth day of April, 1860, offered in evidence in this cause, and purporting to be a codicil to his last will and testament, under the influence of suggestions, importunities or misrepresentations, when his mind, from its enfeebled state, was unable to resist the same; and that the jury must find for the defendants on the second issue.

4. That there is no evidence in this cause that the paper-writing dated on the twelfth day of April, 1860, offered in evidence in this cause, and purporting to be a codicil to the last will and testament of Isaac Tyson, Jr., was procured by undue influences, fraudulent devices,

importunities, misrepresentations and deceits practised upon the said Isaac Tyson, Jr., which, under the circumstances, did not leave him free in the disposition of his estate; and that the jury must find for the defendants on the third issue.

5. Identical with No. 1, except that it applies to the codicil of the 15th of January, 1861.

6. Same as No. 2, except that it applies to the codicil of the 15th of January, 1861, and requires the jury to find for the defendants on the fourth issue.

7. Same as No. 3, except that it applies to the codicil of the 15th of January, 1861, and requires the jury to find for the defendants on the fifth issue.

8. Same as No. 4, except that it applies to the codicil of the 15th of January, 1861, and requires the jury to find for the defendants on the sixth issue.

9. That there is no evidence in this cause that the said Isaac Tyson, Jr., at any time subsequent to the execution of the said paper-writing dated on the twelfth day of April, 1860, purporting to be a codicil to his last will and testament, or at any time subsequent to the execution of the paper-writing, dated on the fifteenth day of January, 1861, purporting to be a codicil to his last will and testament, was desirous of altering or cancelling the said paper-writings, so purporting to be codicils as aforesaid to his last will and testament, or either of them, except so far as he did alter the same by the codicil made on the ninth day of May, 1861, which has been offered in evidence, if the jury shall find the making and execution of the said last named codicil; and that there is no evidence in this cause that the said Isaac Tyson, Jr., was prevented from altering or cancelling the said paper-writing dated on the twelfth day of April, 1860, purporting to be a codicil to his last will and testament, or the paper-writing dated on the fifteenth day of January, 1861, purporting to be a codicil to his last will and testament, or either of

said paper-writings, by management, fraud, undue influence or importunities; and that the jury must find for the defendants on the seventh issue.

The Court (DOBBIN, J.,) rejected the prayers of the caveators, and granted those of the caveatees. To this action of the Court the caveators excepted, and the verdict being against them on all the issues, they appealed.

The cause was argued before BARTOL, C. J., STEWART, BOWIE, ALVEY and ROBINSON, J.

*Charles Marshall* and *William S. Waters*, for the appellants,

Argued that there was evidence on the part of the caveators, applicable to the issues in the case, which should have been submitted to the jury; and they particularly considered the following issues:

1st. Were the codicils in question the result of fraud upon the testator?

2d. Were they the result of undue influence?

3d. Was the testator of sound mind, capable of executing a valid deed or contract when he made them?

The following legal propositions were maintained:

It is the province of the Court to decide questions of law, and of the jury to decide facts. The Court may as matter of law decide that there is no evidence for the jury only when the evidence is of such a character that no rational mind could infer from it the fact sought to be established. Although the testimony be weak, yet if it *tend* to prove the issue, the jury alone can weigh it, and determine its sufficiency. The duty of the Court in determining that there is no evidence at the trial, differs from its duty in a motion for a new trial. The Court in the first can only determine whether any evidence exists, in the second the evidence must be weighed. *Richardson vs. Milburn,* 17 *Md.,* 67; *Fulton vs. Maccracken,* 18 *Md.,*

528 ; *Plank. Road Co. vs. Bruce*, 6 *Md.*, 464 ; *Cole vs. Hebb*, 7 *G. & J.*, 27 ; *Davis vs. Davis*, 7 *H. & J.*, 736.

No matter how strong the weight of testimony may be in favor of any party, if there be any competent testimony on behalf of the other upon which the jury could reasonably find for him, it is error for the Court to undertake to take that right from them. *Charleston Ins. Co. vs. Corner*, 2 *Gill*, 426 ; *Brooke vs. Townshend*, 7 *Gill*, 32.

It has been frequently said with reference to proof of fraud, that such proof is seldom direct. It must be inferred from circumstances, and the only question is, whether a rational mind can infer fraud from circumstances. Fraud, however slight, is sufficient to invalidate a will. It is only necessary that the jury should infer from circumstances that the will was induced by fraud. *Davis vs. Calvert*, 5 *G. & J.*, 269 ; 1 *Wm's Executors*, 42 *and* 43, *No.* 1, *last Ed.*

Persons who occupy fiduciary relations cannot receive benefits from those to whom they bear this relation, unless they show affirmatively that the party was dealt with fairly. That all the knowledge, which the fiduciary had, was given, and the party properly put upon his guard. *Rhodes vs. Bates*, L. R., 1 *Ch. Ap.*, 257 ; *Brooks vs. Martin*, 2 *Wal.*, 85 ; *Hunter vs. Atkins*, 3 *My. & K*, 134 ; *Huguenin vs. Basely*, 14 *Ves.*, 275–300 ; *Allen vs. McPherson*, 1 *H. of L. Cases*, 191 ; *Teakle vs. Bailey*, 2 *Brooke*, 53 ; *Todd vs. Grove*, 33 *Md.*, 197 ; *Dent vs. Bennett*, 4 *Myl. & Cr.*, 277 ; 1 *Story Eq. Ju.*, secs. 311, 315, *and* 332, *note* ; *Highberger, et al. vs. Stiffler*, 21 *Md.*, 349 ; *Brooke, et al. vs. Berry*, 2 *Gill*, 99 ; *Cook vs. Carr and Wife*, 20 *Md.*, 411 ; *Greenfield's Estate*, 2 *Harris*, 490, 504, 508 ; *Sears vs. Shaffer*, 2 *Selden*, 272.

In circumstances depending upon these relations, neither the capacity of the persons conferring the benefits nor the nature of the benefit conferred affects the principle, or dispenses with the necessity of this affirmative

proof on the part of the beneficiary. Among the fiduciary relatives, to which this principle is applied, that of agent and partner are included. (*Same cases.*)

The doctrine is applicable to wills, when one or some of the beneficiaries receive a proportion grossly unequal to the other *Hunter vs. Atkins*, 3 *My. & Keene*, 131 ; *Hughes vs. Hughes*, 31 *Ala.*, 526 ; *Harrel, &c. vs. Harrel*, 1 *Duvall*, (*Ky.*) 205 ; *Wilson vs. Mann*, 3 *N. Y. Sur.*, 780 ; *Wyatt vs. Ingram*, 3 *Hagg.*, 466 ; *Morris & wife vs. Stokes*, 21 *Georgia*, 573 ; *Garvin's admr. vs. Williams, et al.*, 44 *Missouri*, 465 ; *Middleton vs. Sherburne*, 4 *Y. & Coll*, 389 ; *St. Leger's appeal from Probate*, 34 *Conn.*, 450, 451.

*J. S. Tyson, C. J. M. Gwinn, Wm. Henry Norris* and *Reverdy Johnson*, for the appellees.

When a testamentary paper, rational on its face, is produced, and the execution of it is proved, the law presumes that it was made by a person of competent understanding. *Sutton vs. Sadler*, 91 *Eng. Com. L. R.*, 92 ; *Dyce Sombre vs. Troup*, 1 *Deane Eccl. Rep.*, 38, 49 ; 1 *Greenleaf on Evidence*, (11th *Ed.*) sec. 42 ; *Symes vs. Green*, 1 *Swabey & Tristram*, 401, 402, *and* 5 *Jurist*, *N. S.*, 742. Under such circumstances the burden of proof rests upon those who assert unsoundness of mind. *Higgins vs. Carlton and Scaggs*, 28 *Md.*, 142 ; *Baldwin vs. Parker*, 99 *Mass.*, 79.

To make a will invalid, because of importunity or undue influence, that degree of importunity, or undue influence, must be shown to have been employed, which amounts to force or fraud. *Davis vs. Calvert*, 5 *G. & J.*, 302 ; *Wittman and wife vs. Goodhand*, 26 *Md.*, 105 ; *Harbeck vs. Hill, Court of Appeals, October Term*, 1868 ; *Eckert vs. Flowry*, 43 *Penn.*, 46 ; *Lovett vs. Lovett*, 1 *Fos. & Fin.*, 581 ; *Earl of Sefton vs. Hopwood*, 1 *Foster & Finlason*, 578 ; *Stulz vs. Schaeffle*, 16 *Jurist*, 909, *and* 18 *E. L. & Eq.*, 576 ;. *Williams vs. Goude*, 1 *Hagg.*, 577, 3 *Eng. Eccl. Rep.*, 254.

The influence which the affection, or attachment of a testator, may incline him to be governed by, is not improper, and in no wise invalidates a will. *Davis vs. Calvert*, 5 *G. & J.*, 302 ; *Witman vs. Goodhand*, 26 *Md.*, 105 ; *Higgins vs. Carlton & Scaggs*, 28 *Md.*, 125, 144 ; *Earl of Sefton vs. Hopwood* ; 1 *Foster & Finlason*, 578 ; *Parfitt vs. Lawless, before Probate Court*, 21 *Weekly Reporter*, 200.

There was, in this case, no evidence whatever of any importunity, or undue influence. Richard Tyson, another son, and Mrs. Morris, the married daughter of the testator, were benefitted by the codicils which have been drawn in question to as large an extent as were the two sons, James and Jesse. The reasons which induced the testator to appoint James and Jesse his sole trustees, are clearly expressed in the uncontested codicil of May 9th, 1861.

The evidence, on the contrary, internal and external, suffices, in every material particular, to sustain the validity of the two contested codicils.

When there is an entire absence of evidence, or where it is so light and inconclusive that no rational mind can infer from it the fact sought to be established, it is the duty of the Court to instruct the jury that there is no evidence before them to warrant their finding the fact so attempted to be proved. *Harbeck vs. Hill, Exr. of Sewell, Court of Appeals, October Term*, 1868; *Spring Garden Mutual Insurance Co. vs. Evans use of Riley*, 9 *Md.*, 15 ; *Cecil vs. Clarke*, 17 *Md* , 524 ; *Clarke's Admr. vs. Marriott's Admr.* 9 *Gill*, 334 ; *Davis vs. Davis*, 7 *H. & J.*, 39 ; *Eckert vs. Flowry*, 43 *Penn. St.*, 46 ; *Parfitt vs. Lawless*, 21 *Weekly Reporter*, 200.

In construing any will, or codicil, we can apply no extrinsic evidence to alter, detract from, or add to the terms of such testamentary papers, nor to vary the meaning of the words which the testator has employed ; but it

is proper to consider the circumstances under which such will and several codicils were made, the state of the testator's property, of his family, and the like. *Jarman's 8th, 9th, 10th and 12th Rules of Interpretation*; *Baldwin vs. Karver, Cowper*, 312; *Jones vs. Morgan, cited in Lytton vs. Lytton,* 4 *Brown's Ch. Rep.*, edited by *Perkins*, pp. 338, 339. And, in so construing them, although a will and codicils are to be construed as one instrument, yet the circumstances, under which the will and several codicils were executed, supply independent means of interpreting the specific provisions made in each.

The circumstances upon which a Court may rely in the interpretation of a will, or codicil, in cases where there is room for the admission of such evidence, are always to be considered, and are, as must be conceded, of greatest force, when the question is whether a testator, in making any will or codicil, knew and understood what he was doing. 1 *Redfield on Wills*, (*Ed.* 1864,) 124; *Boys vs. Williams*, 2 *Russ. & Myl.*, 697; *Attorney General vs. Grote*, 2 *Russ. & Myl.*, 700, 701.

A careful examination of the facts and circumstances as disclosed by the record, shows that there was no evidence whatever in the case which would have justified the Superior Court in granting the instructions asked for by the appellants.

This Court cannot reverse the rulings of the Superior Court in this case, even if the Court should be of opinion that there was evidence that the testator was not of sound and disposing mind, when he executed the codicils of April 12th, 1860, and of January 11th, 1861, and should also be of opinion that there was evidence that these codicils were both executed under the undue influence and improper circumstances, referred to in the second, third, fifth and sixth issues.

No caveat was filed, or issue prayed as to the codicil of May 9th, 1861.

There is overwhelmning evidence that the testator was of sound mind, and capable of making a valid will at that particular date. No evidence, whatever, to the contrary was adduced. He made a codicil at that date, which he declared, in terms, to be a codicil to his last will and testament, and that he intended by it to revoke all such parts " of the said will, and the codicils already attached," as were incorporated with it.

The testator had the will and codicils of April 12th, 1860, and January 15th, 1861, therefore, fully in mind when the codicil of May 9th, 1861, was executed. He referred specifically to those papers. He said that he intended to revoke so much of them only as was consistent with the codicil then published. He, therefore, in effect, confirmed every part of those testamentary papers, which he did not alter, as positively as if he had declared, in express terms, that he confirmed the unaltered parts. 1 *Wms. on Exrs.* 4th Ed., 175, 179, 180, 181, 182 ; *Pigott vs. Waller,* 7 *Ves.,* 98; *Jones vs. Earle, Exr. of Jones.* 1 *Gill,* 398, 399. In a word, the testator, by the last codicil, brought the will and former codicils down to the date of that last codicil, and republished the will and former codicils as of that date. *Doe d. York vs. Walker,* 12 *Mees. & Wel.,* 599 ; *Boofter vs. Rogers,* 9 *Gill,* 53.

It follows then, that if the testator, at the making of such last codicil, was of sound and disposing mind, the will and codicil so confirmed or adopted, if otherwise formally executed, shall, together with the last codicil, be held to be the will of the testator, whether he was of sound and disposing mind, or under undue influence, when he made the will and prior codicil, or not. 1 *Redfield on Wills,* (*ed.* 1864,) 374. For if the last codicil, made when the testator was of sound and disposing mind, and free from undue influence, adopts and republishes a will and codicil, made when he was insane, or under undue influence,

then the will and codicil, so adopted, become the voluntary act of a capable testator, and are completely valid by reason of such adoption and republication. 1 *Williams on Exrs.*, (*4th Am. Ed.*,) 184; 1 *Jarman on Wills*, (*2nd Am. Ed.*,) 200, *notes.*

The codicil of May 9th, 1861, operated, therefore, as an alteration, adoption and republication of the will of January 7th, 1860, and of the codicils of April 12th, 1860, and of January 15th, 1861, and with this will and codicils, thus republished, became and expressed the true will of the testator.

All the prayers of the appellants, therefore, were defective, and were properly rejected, because they were so drawn as to omit all consideration of the existence and legal effect of that codicil of May 9th, 1861, which had the effect of altering and republishing the prior will and codicils. The instructions should have informed the jury what they were to find from the proof in relation to this codicil of May 9th, 1861, since it was a most important element of the proof in the cause. *Boofter vs. Rogers*, 9 *Gill*, 54, 55; *Burt vs. Gwinn*, 4 *H. & J.*, 517; *Riggin vs. Patapsco Ins. Co.*, 7 *H. & J*, 291; *Bosley vs. Chesapeake Ins. Co.*, 3 *G. & J.*, 450; *Beall's Lessee vs. Beall*, 7 *Gill*, 237; *Cook vs. Carr and wife*, 20 *Md.*, 411, 412; *Md. and Del. R. R. Co. vs. Porter*, 19 *Md.*, 468.

The case now before this Court is part of the case remaining in the Orphans' Court of Baltimore city. It is founded on the instructions of the Superior Court, and upon the verdicts, found on the issues framed, which are parts of that case. *Yingling, et al. vs. Hesson*, 16 *Md.*, 120; *State vs. Stevenson, use of Reigart*, 1 *Gill*, 29; *Warford vs. Colvin*, 14 *Md.*, 556. Being parts of that case, the case now pending, in all its parts, is controlled by other parts of that case remaining in the Probate Court, which has the legal effect to control the case now pending here.

The last codicil of 9th of May, 1861, brought the will and former codicils down to its own date, and operated as a publication of the will as of that date. This being so, the legal effect of the probate of the last codicils, refering to the will and codicils already attached, was a probate finally made of the will, and all the prior codicils, so attached thereto. The probate of this final codicil, so operating, was conclusive as to the personalty embraced in the will and former codicils, and was *prima facie* evidence as to the realty. *Warford vs. Colvin*, 14 *Md.*, 555.

Therefore, there is in force a conclusive probate as to all the personalty, covered by the will and codicils, and a probate setting up a will and codicils as *prima facie* good as to the realty. Though *prima facie* good only as to the realty, the said will and codicils, so probated, operate as conclusive, until they are duly called in question in the mode prescribed by law.

The issues made in this case, therefore, were wholly immaterial, and the opinion of the Court, given in relation to questions arising under such issues, could produce no result upon the probate of the codicil of May 9th, 1861, which operated as a probate of the will and prior codicils attached to said last codicil. As the record shows the probate of the last codicil, and as the law informs us as to the effect of that codicil and of its probate, this Court cannot reverse the instructions given by the Superior Court, because the judgment of the Probate Court, admitting the last codicil to probate, has established conclusively the validity of the will and prior codicils, and of the last codicil, as to personal estate, and the *prima facie* effect of said probate as to realty.

This Court cannot reverse the rulings of the Court in this case without necessitating a re-trial of issues, which are in fact concluded, not by the finding of the jury, but by the judgment of the Orphans' Court admitting the last codicil to probate. It cannot, therefore, reverse in

this case, or order a new trial, *without*, *in fact*, *reversing the judgment of the Probate Court in a case in which that judgment is not really before it.* It must affirm the rulings of the Superior Court, because the probate of the last codicil, republishing the will and former codicils, operate as a record estoppel against any other ruling. The jurisdiction of this Court in this case is only ancillary. It could not reverse the rulings of the Court below in this case, without necessitating the re-trial of issues, which are in effect already concluded by the judgment of the Probate Court upon the last codicil, which republished the first will and codicils. For it would, by so doing, trench upon the jurisdiction of the Probate Court, which had in fact disposed of these issues by its *judgment* upon a codicil wholly uncontested. It cannot *reverse*—but inasmuch as the probate of the last codicil, which is certainly conclusive upon all the world as to personalty, and *prima facie* as to realty, is binding upon this Court, until questioned in due form of law, this Court must affirm all parts of the proceedings, taken under the provisions of the statute, which are in harmony with this final, unquestioned and conclusive probate—for it is conclusive, as far as this case is concerned.

ROBINSON, J., delivered the opinion of the Court.

Isaac Tyson, Jr., died on the 23d November, 1861, and on the 29th of the same month, his will, bearing date the 7th of January, 1860, and three codicils attached thereto, dated respectively April 12th, 1860, January 15th, 1861, and May 9th, 1861, were admitted to probate in the Orphans' Court of Baltimore city.

On the 5th of June, 1871, nearly ten years afterwards, the appellants, infant grandchildren of the testator, and children of his son, Isaac Tyson, 3rd, filed a petition in said Orphans' Court, alleging among other things, that the codicils of April 12th, 1860, and January 15th, 1861,

were procured by *fraud* and *undue influence* practised upon
the testator by his two sons, James W. and Jesse Tyson,
the appellees, and prayed that the following issues be
sent to the Superior Court of Baltimore city for trial :

1st. Whether said codicils were executed by said Isaac
Tyson, Jr., when he was of sound and diposing mind,
and capable of executing a valid deed or contract?

2d. Whether they were executed under the influence of
suggestions, importunities, or misrepresentations, when
his mind from its diseased or enfeebled state was unable
to resist the same?

3d. Whether they were procured by undue influence,
fraudulent devices, importunities and deceits, practised
upon the testator, which under the circumstances did not
leave him free in the disposition of his estate?

4th. Whether at any time subsequent to the execution
of said codicils, the testator was desirous of altering the
same, and was prevented therefrom by management, fraud,
and undue influence or importunities ?

At the trial below, the Court, upon the request of the
defendants, instructed the jury that the plaintiffs had
offered no evidence to warrant them in finding any of the
issues in their favor, to the granting of which, and to the
rejection of the several prayers offered by the plaintiffs,
they excepted.

We do not propose to review the many cases in which
the question as to the legal sufficiency of evidence has
been considered by this Court.

It is sufficient to say, they all hold the rule of law to
be, that whenever the evidence offered is of such a charac-
ter that no rational mind could infer the fact sought to
be established by it, it is the duty of the Court, upon
application, to instruct the jury, there is no evidence
before them legally sufficient to warrant their finding the
fact so attempted to be proved. *Davis vs. Davis,* 7 *H. &
J.,* 39 ; *Cole vs. Hebb,* 7 *G. & J.,* 20 ; *Harbeck vs. Hill,*

582        MARYLAND REPORTS.

Tyson, et al., vs. Tyson's Ex'rs.

*Ex'r. of Sewell, October Term,* 1868, *unreported; Clark vs. Dederick,* 31 *Md.,* 148.

The question then in this case, is whether, assuming all the evidence offered by the plaintiffs *to be true,* and adding thereto every inference which may be fairly and legitimately drawn therefrom, it was sufficient to warrant the jury, in the exercise of a *reasonable intelligence* to find any of the issues in favor of the plaintiffs? These issues involved *testamentary capacity, fraud* and *undue influence.*

As to the first, "the written law of this State, furnishes the rule, by which the capacity of a testator is to be measured.; and the inquiry must always be whether, at the time of executing or acknowledging the will and testament, he was capable of executing a valid deed or contract?" *Davis vs. Calvert,* 5 *G. & J.,* 300 ; *Code,·Art.* 93, *sect.* 300.

In regard to *undue influence,* it is equally well settled, that in order to invalidate a will on this ground, it must be such as deprives the testator of his free agency and subordinates his will to that of another, thus making the testamentary act not the will of the testator, but that of the person exercising the dominion or control over him. *Davis vs. Calvert,* 5 *G. & J.,* 302 ; *Witman and wife vs. Goodhand,* 26 *Md.,* 95 ; *Lovett vs. Lovett,* 1 *Fos. & Fin.,* 581; *Earl of Sefton vs. Hopwood,* 1 *Fos. & Fin.,* 578 ; *Stulz vs. Schaeffle,* 18 *E. L. and Eq.* 576 ; *Williams vs. Goode,* 1 *Hagg.,* 577, 3 *Eng. Eccl., Rep.,* 254.

To sustain the issues then on the part of the caveators, it was incumbent upon them to offer reasonable evidence to show, that the testator was not of a sound and disposing mind and capable of executing a valid deed or contract at the time of the execution of the codicils of the 12th of April, 1860, and the 15th of January, 1861; or that they were executed by him against his *will,* in obedience to a *dominion* or *control exercised* over him, and which he *was unable to resist.*

The doctrine of confidential relations adopted in Courts of Equity in regard to gifts and contracts *inter vivos*, cannot be applied here. It has been extended, it is true, in some States to wills, where parties stood in the relation of guardian and ward, client and attorney, and in such, the burden of proof has been cast upon the legatee or devisee to show that the testamentary act was free from undue influence or restraint. On the other hand, however, in the late case of *Parfitt vs. Lawless*, (21 *Weekly Reporter*, 200) in the Probate Court of England before Lord Penzance, Piggott, B., and Brett, J., this doctrine was held not to apply to wills, for two reasons:

1st. Because in cases of gifts or contracts *inter vivos*, the party benefited takes part in the transaction and whether he unduly urges his influence or not, in calling upon him to explain the part he took, and the circumstances under which the *gift* or *contract* was made, the Court is requiring him to make an explanation within his knowledge, but in the case of a *will*, the legatee or devisee may have no knowledge of the act, and to cast upon him the *burden* of showing how or under what circumstances the *will was made*, would be in most cases to cast upon him a duty he could not possibly discharge.

*Secondly.* Because the influence which is *undue* in cases of *gifts* "*inter vivos*," is very different from that which is required to set aside a will. In the former the *natural influence* which such relations as those in question involve, is considered *undue*, provided it is exerted to obtain a benefit for themselves, whereas in the case of a will the *influence* which the law condemns as *unlawful*, must be such as amounts to force and coercion, destroying the free agency of the testator.

But whether the doctrine of confidential relations applies to wills executed by parties standing in the relation of guardian and ward, client and attorney is a question not necessary to be decided here, for we think it is

clear both upon principle and authority, it does not apply to a devise or bequest by a parent to a child.

We are of opinion therefore, the *burden of proof* both in regard to want of *testamentary capacity* and to the exercise of *undue influence was upon the caveators.*

If so, let us see whether there is any evidence, either upon the face of the codicils themselves, or the circumstances surrounding the execution of the same, the value and extent of the estate of the testator, the relative situation of the devisees and the testator, and the terms upon which he stood to them, from which a jury, in the exercise of a reasonable intelligence, could have found any of the issues in favor of the plaintiffs.

We find by the will of January, 1860, the testator bequeaths to each of his three sons, Richard, James and Jesse, the sum of $25,000, and a like sum in trust for his son Isaac, the father of the plaintiffs, the income thereof to be paid to him for life, and upon his death, the whole sum to go to his children.

The residuum of his estate, he divides into five equal parts, and directs that *Richard, James* and *Jesse*, shall receive *absolutely* one half part of the equal share thus set apart for each, and the remaining half to be held in trust for them under certain limitations therein prescribed. The *whole fifth* share to Isaac, he directs to be held in trust, the income thereof to be paid to him during life, and upon his death to go to his children, subject to an annuity of $1,200 to be paid to his wife during her widowhood. This will is conceded to be in all respects a valid testamentary paper.

By the codicil of April 12th, 1860, he revokes so much of his will as provides for the payment of the whole income arising from the one-fifth equal share devised in trust for Isaac, and in lieu thereof directs the trustees to pay to him *only so much thereof,* as they may in their judgment *" deem proper in view of all the circumstances."*

He also revokes the provision in regard to the payment of an annuity of $1,200 to his widow, and directs in lieu thereof, they shall pay to her only so much as they may think proper, the excess of income over and above what shall be paid to Isaac, to be invested for his children.

By the codicil of January 15th, 1861, the provisions both in the will of January 7th, and the codicil of April 12th in favor of Isaac and his family, are revoked, and the testator bequeaths to his executors in trust, the sum of *fifty thousand dollars,* the income arising therefrom to be applied by them in their discretion to the maintenance of Isaac and his family and the education of his children. He then adds :

" In the bequest here made by me, I have had regard to an estimate, according to my best judgment, of what my estate will probably authorize to be paid, having a due regard to the other members of my family. But inasmuch as it may so happen that such a division would not accomplish my wishes in this connection, and whereas my executors are fully informed of my will in this respect, I hereby authorize them to diminish, at their pleasure, the above sum of fifty thousand dollars during the life time of the said Isaac Tyson, 3d, so as not to reduce it below twenty-five thousand dollars,'' &c.

In addition to the will and codicils thus offered in evidence by the caveators, they proved by G. W. Norris, that for some years before his death, the testator suffered from palsy, was in a feeble state of health, was disposed to take a gloomy view of the value of his estate, and assigned as a reason, that he feared the discovery of chrome in Europe would impair the value of his interest in chrome land, and expressed an apprehension he might not be able to provide sufficiently for his family. About six years before his death, noticed a tendency to fall asleep during conversation on matters of importance to

him, but thought "at that time his mind *was sound*, and *as shrewd a business man as he ever knew.*" Talked with witness in 1859 about making his will, and said "that he thought such of his children as knew how to take care of their property, he would leave them their part free, but that the others he should leave in trust, and that nothing could induce him to make any other difference between his children; did not think a parent had any right to make any other distribution than this, between his children."

He was the most affectionate of parents—spoke of his affection for Isaac's children, and seemed to be more interested in them on account of their father's habits which were known to him at that time.

They also proved by Fanny H. Tyson, mother of the plaintiffs that she was married to Isaac in 1854; went to Rosemont, Virginia, to live; left there because her husband was sent to sea; that the testator expressed doubts as to the propriety of Isaac's going to sea, spoke of his feeble health, that it hung on such a thread that he did not know whether he should ever see him again. He referred to the misunderstanding between witness and the appellees, and how much he regretted it; and spoke of his devotion to the children of witness; that he felt the same towards us as to his other children and grandchildren.

That in December 1859, she came to Baltimore to live, and soon afterwards all friendly relations between her and her husband's family except the testator were interrupted, growing out of certain reports set afloat by a person boarding at the same house with witness. That she never visited the testator's house after April 1860, and from that time received but one visit from him, during which, he expressed affection for witness, solicitude for Isaac and love for the children. Said he was sorry "he had seen so little of us; that he felt near and dear to us and especially to Isaac." On leaving, told her he

would prefer her saying nothing about his visit to his sons or his wife.

That after the death of the testator, friendly relations with the appellees were renewed, they were kind, affectionate and generous in their manner. They alluded to the causes which had interrupted their friendly intercourse, and said they did not believe the stories about witness. Made her handsome presents, and allowed them, as she understood from her husband, between $7,000 and $9,000 a year.

They also proved by Doctor Gittings that he was called to attend the testator at his farm Olney, in Harford County, in the summer of 1861, and found him suffering from an attack of *cholera morbus*. His general health was feeble, seemed to be affected with softening of the *posterior* part of the brain, which affected his power of control over his muscles to a marked degree; trembled and had great difficulty of articulation. Visited him as many as thirty times, but saw nothing in his conversation with testator which induced witness to suppose that his mind was impaired in such a way as to render him *imcompetent to make a will*. The effect of his disease on the nerves and muscles need not have affected his *mental powers*, and with his then knowledge of the testator, would have *attested his will*.

They also proved, the testator died possessed of a large estate, consisting of lands, mines, mining privileges and personal property valued at a *million of dollars*.

In support of the allegations of fraud and undue influence, they offered in addition to the aforegoing facts, evidence to show the intimate and confidential relations existing between the testator and the appellees—that they were engaged with him in business, had opportunities of knowing the value and condition of his estate, and carried on the correspondence in regard to Isaac and his family.

This is the substance of the evidence on the part of the plaintiffs in support of the issues before the jury. We cannot fail to observe, that not a single witness is produced who questions in any manner the *testamentary capacity of the testator*. On the contrary, notwithstanding the feeble condition of his health, his tendency to fall asleep during conversation on matters of importance, his disposition to take a gloomy view of the value of his property, Mr. Norris thought his mind was sound, and that he was one of the shrewdest business men he ever knew. And Doctor Gittings, who never saw him until the summer of 1861, more than six months after the execution of the codicil of January 15th, was of opinion that he was competent even at that time to make a will, and would have attested the same. Not only this, there is not a single act of the testator during his whole life relied on as showing him to be of unsound mind, except the *execution* of the *two codicils* in question.

In regard to the allegation of fraud and undue influence, there is not a particle of evidence to show the appellees ever *advised, persuaded* or *even spoke* to the testator about his will, or had any hand whatever in the execution of these codicils, much less that they were executed by him against his own will, in pursuance *of a dominion exercised* over him by these appellees, such as he was *unable to resist*.

But the argument is, that the evidence thus offered, shows the testator intended to make an equal distribution of his property among his children, and feared lest a bequest of fifty thousand dollars in trust for Isaac, might defeat that purpose; and it is contended that the evidence was sufficient to prove one or the other of the two following propositions:

1st. That the testator did not possess a rational knowledge of the amount and condition of his estate, and was destitute of the first element of capacity to deal with it by contract or will.

2d. That if he possessed capacity to understand and estimate his estate, he was deceived or imposed upon as to its value by some one.

This argument, however, cannot apply to the codicil of April 12th, for it did not affect the equality of distribution made by the will, but only authorized the trustees to withhold from Isaac during his life so *much of the income* of his fifth part as they might deem proper, the excess, if any, to be invested for his children, the caveators. There is no doubt the testator at this time intended to make an equal distribution of his property among his children, as he had said to Mr. Norris in the year previous, he should do, the only discrimination being that those who "knew how to take care of it he would leave free, and those who did not he would leave in trust." This intention is declared in express terms, both by the will and codicil of April 12th.

But it is equally clear, that at the time of the execution of the codicil of January 15th, 1861, this purpose no longer existed. We may not be able to state with certainty all the causes which led to this change in regard to Isaac and his family. It is evident, however, from the codicil of April 12th, that some intervening circumstances had increased the testator's distrust of the fitness of Isaac and his wife to use properly the income provided for them by the will of January 7th. The habits of Isaac subsequent to this time, tended not only to increase this distrust, but taken in connection with the relations existing between his wife and the family of the testator, furnish, we think, a reasonable explanation of the causes operating upon the mind of the testator at the time of the execution of the codicil of January 15th, and which induced him to make a more limited provision for Isaac and his family.

As far back as 1854 Isaac was intemperate in his habits, although as late as 1859, his father, says Mr. Norris, still

had hopes of his reformation. After his marriage, for the purpose of removing him from the temptations of a city life, his father purchased a valuable farm in Virginia, and there he went to live. His old habits, however, still clung to him; he soon became involved in debt, and we find him appealing to his father, *through the appellees,* for money to relieve him from his embarrassments. It finally became necessary to break up the home at Rosemont, and with the hope still of reformation, Isaac in May, 1859, w ts induced to go to sea. In May, 1860, he returned and took a house in Park street, but he soon fell again into his old habits of dissipation, and in the fall of that year he was obliged to give up that house. All efforts towards reclaiming him had thus proved unavailing. In addition to this, the friendly relations between his wife and his father's family, except the testator himself, had ceased as far back as the spring of 1860; and after that time she never visited the house of the testator. It was under these circumstances he went to Mr. Latrobe, his friend and attorney, for the purpose of having the codicil of January 15th prepared, and stated as reasons for revoking the provisions in the will, and codicil of April 12th, 1860, that Isaac's habits were such as he could not rely upon, and that the income from $50,000 was sufficient for the support of himself and family. There is nothing upon the face of the codicil itself, taken in connection with all the facts in the record, to show the testator intended at that time to make an equal distribution of his property, and feared lest the bequest therein might affect that purpose. He nowhere says in this codicil that the sum so bequeathed is an equal share of his estate. If his purpose was to make Isaac equal with the other children, there was no necessity for the execution of the codicil because this purpose had been effected by the will and codicil of April 12th. He does say that in making the bequest he has had regard to an estimate of what his estate would *proba-*

*bly* authorize to be paid, having a *due regard to the other members of his family.* Not, however, that he intended by that estimate to put the bequest thus made on equality with the shares devised in his will to the other members of his family. The causes which led to the execution of this codicil, and to a more limited and unequal provision for Isaac and his family, we have heretofore considered. That the testator had the power to make this discrimination no one will deny, and whether it was just to exercise it against the caveators, was a question for him and not for us to determine.

Having bequeathed fifty thousand dollars in trust for Isaac, upon an estimate of the value of his property at that time, and for fear that this sum might affect the portions intended for the other members of his family, he authorizes his executors upon contingencies not expressed, but known as he says to them, to reduce the said bequest to a sum not less than twenty-five thousand dollars. What was the contingency upon the happening of which the executors were authorized to exercise this power, it is impossible for us to say. It was suggested in argument that this codicil was executed on the verge of the late civil war. The letters written by the testator to his European correspondents about the time of its execution, show how fully he shared the fears and anxieties of all thoughtful men in regard to the then impending political troubles. In the event of war, no human sagacity could foresee its effects upon the value of property, and especially upon mines and mining privileges, in this a border State. But whether or not this was the contingency contemplated by the testator, the caveators have entirely failed to show he did not possess a rational knowledge of the amount and condition of his estate, and was therefore incompetent to deal with it by contract or will. On the contrary, they prove he was of sound mind, and a man of uncommon business sagacity.

In regard to *fraud* and *undue* influence, practised upon the testator, we have not been able to find any reasonable evidence in support of these allegations. The appellees, it is true, were partners in business with the testator, and enjoyed to the fullest extent his confidence, and to which the record shows they were justly entitled. They knew, no doubt also, the value and condition of his estate, but there is no proof to show they ever interfered in any manner, either by advice, persuasion or importunity in the making of his will. Nor does it appear that their relations with the testator had any influence with him in the disposition of his property. His other children, Richard and Hannah, receive an equal share with the appellees under the will, and Isaac is the only one against whom a discrimination is made. In all the letters written by these appellees, in the years of 1858 and 1859, we have not been able to find a single unkind expression towards Isaac; they are full of affection, sympathy, advice, and hope of his reformation. And when the father is gone, and all are stricken with a common grief, the fact that the appellees are anxious to forget the past, and all causes which had interrupted friendly family relations with the mother of the caveators—that instead of $3,000, they in a spirit of generous affection allowed their brother Isaac and his family $7,000 to $9,000, cannot surely be construed into an evidence of an unlawful participation in the will of their father, through which Isaac and his family were denied an equal share of the estate.

So, we say, admitting all the evidence offered on the part of the caveators to be true, and adding thereto every legitimate inference, it was not sufficient to warrant the jury, in the exercise of a reasonable intelligence, in finding any of the issues in favor of the plaintiffs. Not only is there an entire failure of evidence on their part, but the proof on the part of the defendants is perfectly conclusive on all the issues.

Tyson, et al., vs. Tyson's Ex'rs.

The codicils were prepared, says Mr. Latrobe, under the direct instructions of the testator, who was alone with him during the preparation of the draft—they were read to him, amendments made at his suggestion until they were satisfactory to him and then executed. The witness had no more doubt of the *mental competency of the testator* to make the *codicils in question*, than he had of his own *mental competency*. The testator had been in the habit of coming to the office of witness for a number of years, and continued as late as May, 1861. He talked about politics, condition of the country, the Baltimore and Ohio Railroad Company and other topics of conversation, discussing all subjects with great intelligence. His health was *feeble*, but his *mind-clear*.

Mr. Galloway Cheston had known him for many years; had repeated interviews with him as late as May, 1861; saw him in his counting room in April, 1861, his mind was perfectly clear, he was as rational as he ever had been, and even in business matters in which his sons were equally interested, *his was the master mind*. He was eminently a sagacious man, whose opinion he would have taken upon any monetary question.

Mr. Francis T. King says, he was an intimate friend of the testator, and their intercourse was frequent and familiar. So late as the spring of 1861, in conversing about matters of business, investment of money, purchase of property, and about making his will, he never discovered the least *impairment* of his mind. He was a man of culture, of reading, of determination, of great self-government, and thought and acted on all questions for himself. These characteristics remained with him to the end of his life.

Then they prove by Thomas W. Webster that he was clerk to the testator from early in 1861 to the time of his death; that the testator was in the habit of coming to the office regularly until the latter part of June, 1861, when he

went into the country ; that he always looked into what was going on ; the correspondence of the firm was carried on under his eye, he dictated to one of his sons or his clerk, it was then read to him and corrected by him, and when approved it was copied and handed to him to sign. His *mind was perfectly unimpaired.* Other witnesses corroborate this testimony. In such a case as this, whatever ground there may have been for ingenious argument and eloquent comment of counsel, there was no evidence legally sufficient, to warrant the jury in finding any of the issues in favor of the plaintiffs.

Entertaining these views it is unnecessary to consider whether the subsequent codicil of May 9th, 1861, and which· was not caveated, operated as an alteration, adoption and republication of the will of January 9th, 1860, and of the codicils of April 12th, 1860, and January 15th, 1861.

*Rulings affirmed.*

(Decided 22nd February, 1873.)

Bowie, J., delivered the following dissenting opinion :

The last will and codicils of Isaac Tyson, Jr., were probated in common form, in the Orphans' Court of Baltimore City, on the 29th of November, 1861, by his executors, James and Jesse Tyson, and the petition of the appellants, caveating the codicils of the 12th of April, 1860, and the 15th of January, 1861, was filed the 5th June, 1871.

On the 28th of August, 1871, plenary proceedings having been instituted by the appellants, the Orphans' Court directed several issues to be sent for trial, to the Superior Court of Baltimore.

These issues presented substantially the questions whether the papers dated the 12th of April, 1860, and 15th January, 1861, respectively, purporting to be codi-

cils to the last will and testament of the deceased testator, or either of them, was procured by fraud, misrepresentation, undue influence or other devices which he was then too weak to resist, etc.

At the trial in the Superior Court, a verdict was found for the defendants, after a series of prayers submitted respectively by the caveators, and caveatees ; those of the former being refused, and those of the latter granted ; to which action of the Court below the appellants excepted and prayed an appeal. The instructions granted at the instance of the appellees, among other propositions declared, that there was no evidence in the cause, that the testator executed the paper writings of the 12th of April, 1860, and of the 15th of January, 1861, purporting to be codicils to his last will and testament, under the influence of suggestions, importunities, or misrepresentations, when his mind from its enfeebled state, was unable to resist the same, and that the jury must find for the defendants on the second and fifth issues.

That there was no evidence in the cause, that the said paper writings were procured by undue influence, fraudulent devices, importunities, misrepresentations and deceits, practised upon the testator, which under the circumstances, did not leave him free in the disposition of his estate, and that the jury must find for the defendants on the third and sixth issues.

Among the propositions submitted by the appellants and rejected by the Court were the following :

1. If the jury should find from the evidence, that in executing the codicil of the 15th January, 1861, the testator was influenced by an estimate of his estate, such as no rational mind would have made in view of the actual value of his estate, as shown by the evidence, the jury might find that he did not at the date of said codicil possess testamentary capacity, and so finding, their verdict should be for the caveators on the fourth issue, not-

withstanding they might find that the testator, as to all other matters, was sane and rational and capable of making a valid deed or contract. And in ascertaining whether said alleged codicil was executed under the influence of such an estimate, the jury might consider the codicil itself, the original will and first codicil, and the proof offered as to the actual amount and value of the estate of the testator, and all the other facts and circumstances of the case.

2. If the jury believed the alleged codicil of the 15th of January 1861, was executed by the testator under the influence of an estimate of his estate, and at that time, and before, by reason of age and infirmities was unable to manage his property without the assistance of his executors, who in consequence of his debility, had been entrusted with the management of his estate, so as to enable them to know its real amount and value; and the testator so confided in them, that at the time of executing the said codicil, they possessed influence over him, and that the estimate of his estate, under the influence of which he executed said codicil, was false and inconsistent with its actual value, and the said executors derived advantage from the execution of the said codicil, and were aware that the testator in making the codicil was influenced by such false estimate, then, unless the jury believed the said executors informed the testator, the said estimate was erroneous, the jury might find the said codicil was obtained by fraud, notwithstanding they might believe the testator was of sound mind and capable of making a valid deed or contract. And in ascertaining whether the testator was influenced to make said codicil by a false estimate of the value of his estate, the jury might consider the original will and the first and second codicils, in connection with the other testimony in the case.

3. If the jury believed that the testator was induced to make the codicil of the 12th of April, 1860, by belief in

the truth of the reports as to the conduct of the mother of the caveators, and such reports were calculated to prejudice his mind against her, and the defendants by their influence over him induced him to believe said reports, and withheld all social intercourse with her, pretending to believe said reports as long as the testator lived, and after his death, renewed their intercourse, declaring they had not believed them, the jury might find the codicil of the 12th of April, 1860, was obtained by fraud and undue influence, etc.

5. That there was evidence on the face of the codicil of January 15th, 1861, from which the jury might find, that the executors at the time of its execution, were aware the testator made the same on the basis of an estimate of his estate, and that the said estimate, and the effect which it would have upon the disposition of the estate of the testator, by the codicil, was also known to the executors at the time of its execution.

The last prayer was rejected "as unnecessary to be passed upon by the Court, seeing that the Court has already determined by the granting of the caveatees' prayers, that there is no sufficient evidence upon which they can find for the plaintiffs—the caveators. A synopsis of the evidence offered by the caveators to support the issues, on their part, is necessary to enable us to judge of the correctness of the propositions submitted in their prayers and of the propriety of the action of the Court, in rejecting them and granting the instructions given by it, in favor of the caveatees. The evidence embodied in the bills of exceptions consists of written documents, letters, and oral testimony, too voluminous to be repeated, but its substance will be condensed as far as practicable in illustration of these views. Evidence was offered by the caveators, tending to prove that the testator was a gentleman far advanced in age, as far back as 1856 or 1857, in very bad health, tremulous, and palsied; in consequence

of which extreme ill health, his sons, Jesse and James, had taken hold of his business.

His estate at the date of his will, 7th January, 1860, was worth nearly $800,000.

His family consisted of a wife, a daughter and four sons, Jesse Tyson, Isaac Tyson, called Isaac the 3d, James W. Tyson and Richard W. Tyson.

Isaac Tyson the 3d, was married and had two children living at the death of the testator.

In a conversation in 1859, with a witness, he said that he thought that such of his children as knew how to take care of their property, he would leave them their part free, but that the others he would leave in trust, and that nothing could induce him to make any other difference between his children ; that he did not think a parent had any right to make any other distribution than this between his children ; that testator was the most affectionate of parents.

At this time, the habits of Isaac Tyson, the 3d, were bad. His father seemed to have more affection for him than for any other of his children.

He knew his habits when he stated his views of his duty to his children, and the habits had at that time been for some years as bad as they could be. He spoke of his affection for Isaac's children and seemed to be more interested in them on account of the father's habits.

Isaac Tyson, the 3d, had become deeply embarrassed from improvidence or other causes. His family and himself were supported by his father. His household establishment in Virginia was broken up; he was induced to go to sea, (according to the evidence of the caveators) by the influence of his mother and brothers, against the wishes and advice of his father, and his wife and children boarded in Baltimore.

In this state of affairs, the testator, shortly before the date of his will, (the 7th of January, 1860,) called on his

counsel, and told him he wanted him to draw his will. "He brought to the witness, a will which had been drawn for the testator by Mr. Talbott, of the firm of Dobbin & Talbott.

He said he wanted *a shorter and less technical will*, and witness accordingly drew a shorter paper in more familiar language. The testator's counsel testified that the testator had frequently talked to him of making a new will, but had done nothing towards carrying that purpose into effect, until he came to the office of the witness, bringing with him a draft of the will made by Mr. Talbott. He objected to the technical language of that will; and witness therefore expressed the same ideas in his own language. There was no alteration in the substance.

The will of the 7th January, 1860, modelled on one previously drawn by Mr. Talbott was then executed.

This will, after making provision for his wife, devised to his three sons, Richard, Jesse and James, as trustees, in trust for his daughter, Mrs. H. A. Morris, twenty-five thousand dollars. To his sons, Richard, Jesse and James, $25,000 each.

After reciting that he had been engaged in partnership with his son Jesse in carrying on chrome works, and investing his executors with discretionary powers to continue the same, providing compensation to them for such services, he devised to the trustees in fee the residuum of his estate to be divided into five equal parts, and held in trust as follows: one-fifth in trust for Mrs. Hannah A. Morris, for her sole and separate use; one-fifth in trust for Richard W. Tyson; one-fifth in trust for Jesse Tyson; one-fifth in trust for James W. Tyson; one-fifth in trust for his son Isaac Tyson, the 3d, for life, he to take and receipt for the income thereof only, but without power of anticipation or involuntary alienation; should he die without child, children or descendants, the said one-fifth to go to the brothers and sister of Isaac; should he leave

a child or children, the said fifth to go to said child or children, and should all of the children of said Isaac die without descendants, the said fifth to go to the brothers and sisters of the said Isaac, "*per stirpes*," and not "*per capita;*" the said fifth in whosoever hands it might be, to be subject to an annuity of $1.200, payable to the widow of said Isaac, during her widowhood. The will further directed that all sums. charged against his sons and daughter in his books, at his death, and all moneys for which he might be responsible on their account at that time, should be charged against their respective legacies and portions of his estate, by his executors.

About four months after the execution of the will, without any ostensible reason or apparent change in the conduct or condition of the devisees, the codicil of the 12th of April, 1860, was executed.

This codicil revoked so much of the will as relates to the payments therein directed to be made to his son Isaac Tyson the 3d, and his wife, in the event of his dying before her, and directs the trustees to pay Isaac only so much of the income *as in their judgment may be proper in view of all the circumstances, and instead of* $1,200 *to his wife, if she survived him, to pay her only such part as they may think proper;* the excess of the income to be held in trust for the benefit of Isaac, and the excess of the allowance to his wife to be held in trust for the benefit of the children of said Isaac.

The codicil of the 15th of January, 1861, was next executed.

It declares that its provisions in regard to his son Isaac Tyson the 3d, his wife and children, shall be substituted in lieu of the provisions made for them in his last will and testament, which are thereby revoked and annulled. By this codicil the testator bequeathed $50,000 to his executors, etc., in trust, to be invested by them in their discretion, in securities producing income, and held for the following purposes:

1st. In trust during the life of his son Isaac, to expend the income thereof, in their discretion as to time, manner and objects of expenditure, for the maintenance of said Isaac and his family, and the education of his children.

2dly. At the death of said Isaac, the sum of $50,000 shall be held by his executors in two sums of $40,000 and $10,000, respectively. So much of the income of the sum of $40,000, as may be allowed for the purpose by the Orphans' Court of Baltimore city, to be paid to the guardian of the children of said Isaac, living at the time of his death, for their education and maintenance; the surplus to be invested for the benefit of the children.

3dly. At the death of his son Isaac the income of the sum $10,000 to be paid to his widow, so long as she remains *sole,* and on her death or marriage, the principal to be added to the fund of $40,000, for the benefit of the children.

It was further provided, should Isaac survive his children, then on his death and that of his widow, the sums of $40,000 and $10,000 above devised should become a part of the residuum of his estate, and divided as already provided, except that the residuum should be divided into four parts and not five, the codicil being intended to provide for his son Isaac, as aforesaid, "who under my original will was to receive a fifth part of the residuum."

The codicil concludes with this remarkable clause: "In the bequest here made by me, I have had regard to an estimate, according to my best judgment, of what my estate will probably authorize to be paid, having a due regard to other members of my family. But inasmuch as it may so happen that such a division would not accomplish my wishes in this connection, and whereas my executors are fully informed of my will in this respect, I hereby authorize them to diminish at their pleasure, the above sum of $50,000 during the life time of Isaac the 3d, so as not to reduce it below $25,000; and the above mentioned sum of $40,000, after his death, so as not to reduce

it below $20,000, and the said sum of $10,000, so as not to reduce it below the sum of $5,000. It being understood that the sum of $50,000 includes as well the sum of $40,000, as said sum of $10,000.''

The third and last codicil, dated the 9th of May, 1861, declares that having by his will appointed certain duties to be performed by trustees, and being satisfied his will would be simplified by making the same persons executors and trustees, he directs that the executors named in his will, shall be also trustees, and invested with all the powers conferred on the trustees, his purpose being to concentrate in his executors the powers and duties in his will and codicil divided between the executors and trustees.

The counsel of the deceased, who drafted the will and codicils, testified that when he prepared the codicil of the 15th January, 1861, the habits of Isaac Tyson, the son, were referred to by the testator as a reason for making that codicil. The consequences to ensue from making it were never a subject of discussion. They never talked about the effect the codicil would have on the children of his son Isaac.

It was further in evidence on the part of the appellants that Isaac Tyson, the 3d, was sent to sea in the year 1859, by the conjoint advice and influence of Jesse and James Tyson and their mother, contrary to the wishes of their father, and that the wife and children of Isaac Tyson the 3d, came to Baltimore, and were established at a boarding-house; that James and Jesse wanted the wife to go to the country-seat of their father, and occupy the *overseer's* house, whilst their father wished her to occupy the farm-house.

Soon after her arrival in Baltimore a misunderstanding arose between James and Jesse and their families, and the wife of Isaac the third, the mother of the appellants, in consequence of certain defamatory rumors uttered

against her, and a non-intercourse ensued, but the testator visited her privately, and desired her not to mention his visits to his sons or his wife.

The testator continued affectionate in his manner toward the wife of Isaac, and expressed his solicitude for her husband and her children.

During the residence of the wife of Isaac Tyson the 3d, at this boarding-house, her husband returned from sea, but did not visit her for sometime, and an attempt was made by one of the executors, and her husband, to take her children from her and carry them away.

During this estrangement between the sons and executors of the testator, and the wife of Isaac Tyson the 3d, the codicil of the 12th April, 1860, was executed, whereby the provisions of the will giving annually to Isaac Tyson, the 3d, during his life, the whole amount of the profits accruing to him from his portion of the testator's estate, and also to Fannie Tyson, wife of said Isaac, in the event of his death, twelve hundred dollars, as an annuity to be paid to her during her widowhood, was revoked, and the executors were directed to pay to Isaac Tyson the 3d, so much only of the income of his fifth part of the estate as in their judgment might be proper in view of all the circumstances, and in lieu of $1,200 to be paid to his wife, should she survive him, to pay to her, *in their discretion* only such part, *if any thereof*, as they might think proper.

An experienced physician, who visited the testator, in the summer of 1861 professionally, as many as thirty times, deposed that the testator's general health was very feeble; he seemed to be affected with softening of the posterior part of the brain, which in his opinion was of some years standing. It was the strongest case of the kind the witness had ever seen; he had a history of the case from Dr. Norris, and knew that it had been coming on for several years.

That one of the first symptoms of such a disease as the testator had, is often seen in its effect upon the mind of the patient, in producing or confirming morbid feelings and impressions as to persons and things.

The witness said he saw nothing in his conversations with the testator which would have induced him to suppose his mind was impaired in such a way as to render him incompetent to make a will. The effect of his disease on the nerves and muscles need not have affected his mental powers.

"Being asked the hypothetical question, that if he had known at the time he saw him, that the testator was a very wealthy man, and that his estate was sufficient to pay the sum of $50,000, without being seriously impaired, and that the testator's estimate of its value was such as to make him apprehend that such a sum or a less one could not be paid from it to one of his children without endangering a due provision for the other four, would he have attested his will? The witness answered, no; he would have considered him crazy, and that he had not a reasonable knowledge and opinion as to his estate."

The appellants gave in evidence the list of debts returned by the executors 22d October, 1862, showing sperate debts to the amount of $459,801.40; doubtful debts, $40,182.65.

Among the debts in the schedule of the sperate, due by the children of the testator, were,

| Jesse Tyson | $13,092.84. |
| Jas. W. Tyson | 132,505.77. |
| Jesse Tyson & Co | 162,146.12. |

Among the debts reported doubtful was

| Isaac Tyson | $28,340.84. |

The caveators, assuming they had shown by sufficient evidence that the testator, being of sound mind and memory, and capable of disposing of his estate by last will,

had made a will in conformity with previous declarations of his intention, and natural love and affection, providing for an improvident son, and his family, then knowing all the infirmities of the prodigal, and anxiously protecting him, and his wife and children, by creating a trust in their behalf; that three months thereafter, whilst the son was at sea, without any provocation on his part, the dispositions of the will providing for the son and his wife, during their joint lives, and the widowhood of the wife in case she survived, were revoked, and their allowance reduced to such sum as the caveatees in their discretion should allow; that the caveatees at this time were not on visiting terms with the mother of the caveators; that by the operation of the second codicil, made evidently with the privity of the caveatees, the testator under an apprehension that his estate, "having regard to the other members of his family," would not warrant a more liberal provision, reduced the share of Isaac Tyson the 3d, and his children, from one-fifth of the residuum of his estate to $50,000, with an authority to the executors to reduce it to $25,000; the residuum of his estate being divided by the same instrument into four parts instead of five; and the portion of the caveatees thereby increased; that this codicil was evidently made under a morbid misapprehension of his own circumstances, with the knowledge of the caveatees.   That the estate of the testator was worth nearly a million of dollars; and the caveatees were its principal debtors.   That all the changes made in the original will, enured to their benefit and advantage, and the ostensible reasons for them were unreal or delusions. That the testator during this time was extremely aged, palsied and dependent in a great measure, physically as well as mentally, on the caveatees for the management of his affairs, contended that from these premises it necessarily resulted that the codicils of the 12th April, 1860, and the 15th of January, 1861, were the productions of a non

sane mind, or of a weak and morbid intellect, moulded by influences, and controlled by agents, it was too feeble to resist.

The prayers of the caveators presented the affirmative of these propositions, and those of the caveatees the negative, with some particular exceptions; the general effect of the whole being as stated in the record that the Court determined by granting the caveatees' prayers, that there was no sufficient evidence upon which the jury could find for the plaintiffs, the caveators.

The effect of these prayers was to withdraw the facts from the consideration of the jury, and submit to the Court the question, whether, conceding all that had been offered in evidence on the part of the caveators to be true, and all inferences reasonably deducible from them, they were sufficient in law to support any of the issues in favor of the caveators. In other words, the prayers were demurrers to the evidence, and subject to the same rules and limitations, and can only be proper where the demurrer to evidence would be. As to the latter, the following principles are established:

"If the plaintiff or defendant give in evidence matter of record or parol evidence on which a doubt in law arises, the other side may demur to the evidence; *otherwise if there be a doubt whether the fact be well proved,* for the jury may find it on their own knowledge. 2 *Stephens N. P. Tit. Evid.*, 1792; *Buller N. P.*, 312, (*a*;) *Coke Litt.*, 72, (*a.*)

"In *Wright vs. Pindar, Aleyn.* 18, it was resolved, 'that he that demurs upon the evidence ought to confess the whole matter of fact to be true, and not refer that to the judgment of the Court; and if the matter of fact be uncertainly alleged, or that it be doubtful, whether it be true or no, because offered to be proved only by presumptions and probabilities, and the other party will demur thereupon, he that alleges this matter cannot join in

demurrer with him, but ought to pray judgment of the Court, that he may not be admitted to his demurrer, unless he will confess the matter of fact to be true." 2 *Stephens' N. P.*, 1793.

The books also agree that if parol evidence be offered, and the adverse party demur, he who offers the evidence may join in the demurrer if he will. But the language of the old books is very indistinct upon the question whether the party offering the parol evidence shall be obliged to join in the demurrer. *Tidd's Prac.*, 866; *Stephens' N. P. supra.*

On demurrer to circumstantial evidence the party offering the evidence is not obliged to join in demurrer, unless the party demurring will distinctly admit upon the record every fact and every conclusion which the evidence offered conduces to prove. *Gibson vs. Hunter*, 2 *H. Black.*, 187; 6 *Bro. P. C.*, 255, *cited by Stephens.*

"On the demurrer to evidence, the only question for the consideration of the Court is, whether the evidence given be such as ought to be left to the jury in support of the issues joined; and no objection can be made to the declaration or other pleadings in that stage of the cause; for the party ought to admit the whole effect of the evidence, and not merely the facts which compose it; so that, if it be only presumptive, he must distinctly admit every conclusion, which the jury might have drawn from it." 2 *Hen. Black.*, 187, *cited in* 2 *Stephens' N. P.*, 1793.

The jealous regard for the maxim of the common law, "*ad questiones facti respondeant juratores,*" shown by the preceding authorities, upon demurrers to evidence, is indirectly, if not so emphatically expressed, in the decisions of this Court, as to the circumstances under which they feel authorized to withdraw the facts from the consideration of the jury, and the concessions to be made by the party asking the Court to declare the law upon the facts given in evidence.

In *Davis vs. Davis*, 7 *H. & J.*, 36, this Court declared: "Wherever the testimony adduced by a plaintiff, is so light and inconclusive, that no rational, well-constructed mind can infer from it the fact which it is offered to establish, it is the duty of the Court, when applied to for that purpose, to instruct the jury there is no evidence before them to .warrant their finding the fact thus attempted to be proved."

In *Cole vs. Hebb*, 7 *G. & J.*, 20, this Court referring to the same subject, define their duty thus:

"An issue is made up of *one or many facts* according to circumstances; and where the evidence does not establish all the facts, either directly or by *rational deductions*, as where there is a failure of evidence in respect of any. *one* material. fact involved in the issue, in such case, the evidence is not legally sufficient to warrant the jury in finding the issue which it is offered to sustain, and it is the duty of the Court to instruct them accordingly."

In the earlier case of *McElderry vs. Flannagan*, the following propositions, were announced: "The jury alone are competent to decide on facts of which contradictory evidence may be offered. Before the Court can legally give an absolute instruction to the jury on the prayer of one of the parties, they must admit the truth of the testimony offered by the other, and that also offered by the first, which may operate in his opponent's favor, and the existence of all material facts which a rational mind can deduce therefrom, *even though contradicted in every particular by the testimony of him who seeks the instruction.* Upon no other principle can the cause be withdrawn from the consideration of the jury." 1 *H. & G.*, 308.

In *Ferguson vs. Tucker*, 2 *H. & G.*, 183, the Court defines the power to instruct the jury in these very forcible terms: "The prerogative of the Court which authorizes them to withdraw from the jury, the consideration of the facts, is never exercised but in cases where the

evidence is so indefinite and unsatisfactory, that nothing but wild, irrational conjecture, and licentious speculation, could induce a jury to pronounce the verdict which is sought at their hands." See also *Gray vs. Cook*, 12 *G. & J*, 236.

The conditions on which Courts of law in this State, exercise what is called their prerogative, to withdraw the facts from the consideration of the jury are, it would appear from the foregoing decisions, and many others that might be cited, the same that govern the Courts of England upon demurrers to evidence viz: Every fact, and every rational inference from the facts proved by the party offering the evidence, must be conceded to be true, without reference to the opposing testimony, and the evidence must be so light and inconclusive that nothing but licentious speculation could induce a jury to pronounce the verdict sought for.

We have seen that in England, where the issue is to be supported by circumstantial evidence or presumptions, the party offering the evidence could not be compelled to join in the demurrer to evidence. ·

Because the demurrer would only lie where the facts were ascertained, or certain, or there was a fixed standard to be appealed to, to determine their sufficiency to establish the issue to be proved. The Court would not undertake to draw inferences from facts.

From the principles on which demurrers to evidence, or instructions to juries that the evidence is not sufficient, are founded, the fact or issue to be found, must be one of a certain defined character, the constituent elements of the proof of which, are established and defined by law. In the case of the *Mayor and City Council of Baltimore vs. Williams*, speaking of a prayer asking the Court to instruct the jury that if they believed certain facts, then the deed was void for fraud, this Court said, "This prayer has been resisted, upon the ground that there is

no evidence to support it.    We are not now sitting as a
Court of Equity, to decide whether the evidence or cir-
cumstances relied upon by the appellees can be sufficient
to establish the allegation of fraud, and consequently
we are not called upon to say whether there is proof
enough for that purpose.    But the instruction asks a
Court of law to submit a question of fraud to the jury;
and although we might believe the evidence not strong
enough to require the jury to find the fraud, yet if there
is any evidence legally tending to prove it, such a prayer
could not properly be rejected.   6 *Md.*, 267.   In the
leading case of *Davis vs. Calvert*, 5 *G. & J.*, 269, this
Court referring to questions then before them, on issues
and prayers very similar, held this language:    "There
is no question before us relating to the construction of
the will.    Nor is it a question before this Court, whether
the evidence offered, if true, would be sufficient to sustain
the issues on the part of the appellants.    That is not a
subject for consideration on this appeal    All that we are
called upon to do, and can legitimately do, is to decide
upon the *competency of that evidence* and the correctness
of the instructions given to the jury."

Adverting to the issue of fraud, and the testimony
necessary to support it, they thus announce the law.
"Fraud vitiates every thing with which it is connected.
A will or testament obtained by fraud is void, and though
fraud is never to be presumed, yet it is not necessary to
prove it by positive and direct testimony.    But being
usually wrapt up in mystery, if well concerted, it is gen-
erally by circumstances only, by inductions of particu-
lars, some of them often apparently trivial, that it can be
brought to light and defeated.    And in a question of
fraud, any fact, no matter how slight, bearing at all on the
point at issue, and not wholly irrelevant, may be admit-
ted.    But the circumstances when combined and consid-
ered by the jury, should be so strong as to satisfy them of

the existence of the fact, they are offered to establish."
* * * * "In short no competent means of ascertain-
ing the truth ought to be rejected; and all the surround-
ing facts of a transaction that can be established by
competent evidence may be submitted to a jury who are
the judges of their force and effect. Applying these prin-
ciples of law, and rules of evidence to the present case, the
testimony offered at the trial on the part of the appellant
and rejected by the Court, should have been suffered to go
to the jury as evidence of facts relevant to, and tending to
prove the issues."

The remarks above cited, as their context implies, were
made upon the rejection of certain items of evidence in
the progress of the trial, but if the law requires every
circumstance tending to prove the issue, however slight
to be submitted to the jury, does it authorize the whole
evidence, when collected, to be withdrawn from their
consideration, by an instruction, in the nature of a
demurrer to evidence, declaring there is no evidence to
support issues, (involving an infinite variety of facts and
inferences) but the jury *must* find for one or the other of
the parties to the cause? What difference in effect, upon
the right of trial by jury, is there between rejecting the
evidence in mass, after the testimony has been closed,
and rejecting it in detail, as the trial progresses? The
several items of evidence, could only have been admitted
upon the presumption they tended to prove some of the
issues joined, and when collected, they could not be of
less weight. Their admission presupposes their compe-
tency in law; their sufficiency in fact, is a question exclu-
sively for the jury.

Conceding that where an issue is made up of one, or
many facts, according to circumstances, and the evidence
does not establish all the facts, either directly or by rational
deductions, as where there is a failure of evidence in
respect of any one of the material facts involved in the

issue ; in such case, the evidence is not legally sufficient
to warrant the jury in finding the issue which it is offered
to sustain, and it is the duty of the Court to instruct them
accordingly, yet where the issues are to be sustained by
inferences from facts to be found by the jury, by circum-
stances chiefly, and inductions of particulars, it is clear
we think, the facts can no more be withdrawn from the
consideration of a jury, by a prayer or instruction, than
by a demurrer to evidence, which it is shown by authori-
ties, cannot be had in such circumstances.

The power can only be exercised, without infringing on
the province of the jury, where the measure and quantity
of proof are established by law.

Fraud and undue influence, are facts to be deduced
from an infinite, undefined and undefinable variety of
circumstances, which the Courts have refused to limit and
prescribe, lest the ingenuity of evil, might assume other
shapes to avoid the ban of the law, and escape its vigilance.
The legal maxim "*Dolus crescit in orbe*" denotes its
prevalence, and under whatever mask it may appear, its
devices, however specious, are defeated.

This Court has recently in a series of much litigated
cases on the subject of negligence laid down very clearly
the principle which should control the Court, in my judg-
ment, upon application, for instructions to the jury on the
legal effect of evidence.

In the case of the *Balto. & Ohio R. R. vs. The State use
of Dougherty*, 36 *Md.*, 377, the defendants endeavored to
procure a prayer from the Court, instructing the jury what
constituted negligence; the plaintiffs resisted the prayer
on the ground that negligence was a fact for the considera-
tion of the jury. Quoting from preceding decisions 21 *Md.*,
275, 24 *Md.*, 53, for the general proposition that what con-
stitutes negligence was properly referred to the jury, they
proceed: "Negligence, in a case like this, is not so much
a question of law, as it is a question of fact, depending

for its determination upon a consideration of all the attend-
ing facts and circumstances in connection with the ordi-
nary habits, conduct and motives of men.  For the trial
and determination of such a question a jury of experienced
and intelligent men are peculiarly adapted."

"It is very true, negligence may in many cases become
a question of law, to be determined by the Court, *upon a
given state of facts, either admitted or to be found by the
jury.*"

"It is not, however, the duty of the Court to draw
inferences and make deductions from evidence.  To do
that falls within the well defined province of the jury,
that Courts should ever be careful not to invade."  29
*Md.*, 420.

Fraud is not be considered as a single fact, but a con-
clusion to be drawn from all the circumstances of the case.
*Brogden vs. Walker*, 2 *H. & J.*, 285, *per Hanson Ch.*; 6 *H.
& J.*, 442 ; *Davis vs. Calvert*, 3 *G. & J.*, 269.

A plea of fraud, at law or in equity, never sets out the
facts and circumstances which constitute the fraud.  A
demurrer could not be filed to such a plea, because there
is no legal standard of what amounts to fraud.  For the
same reason a demurrer to the evidence could not be sus-
tained if there is a particle of testimony tending to prove it.

It may not be unworthy of consideration that the issues
in this case, were sent from the Orphans' Court, under a
statutory provision, intended to secure to suitors in that
Court, the right of trial by jury in all cases in which issues
of fact arise.

The law never designed that the trial of facts should
be transferred from the judges of the Orphans' Court to
the judges of the Courts of law, but to engraft upon the
limited jurisdiction of the former, the trial by jury, that
suitors might have the protection and benefit of that mode
of ascertaining facts, and the Orphans' Court be aided
and assisted by the verdict.

It is true that on the trial of issues from the Orphans' Court, the Circuit Courts are invested with the same powers, as in trials by jury originating in those Courts, yet the policy of the law would seem to dictate that a greater latitude should be allowed in issues involving the investigation of an infinite variety of facts, and incapable of being reduced to any single fact or ascertained state of facts, than in Courts of law.

STEWART, J., delivered the following dissenting opinion:

In addition to the reasons urged by my brother BOWIE, in his dissenting opinion, in which I fully concur, there are other considerations, which weigh with me, looking to the relative duties of the Court and jury; and the right of litigants, under our system of jurisprudence, to claim as matter of strict law the benefit of a trial by jury.

Suggestions as to the feelings and prejudices of juries, and the supposed greater freedom from such influences on the part of the Court, have no application to the determination of the question. Its solution is solely dependent upon its constitutional and legal bearing.

It is a maxim of the common law, that it is the province of the Court to determine questions of law in the trial of causes, and of the jury to weigh and consider the import and bearing of facts.

Under our present Constitution, the parties litigant may refer both duties to the Court, but without their mutual consent, neither party can be deprived of his right of trial by jury.

Some question had perplexed the Court as to the proper application of the relative duties of the Court and jury in criminal proceedings; but that was set at rest by the constitutional provision that in criminal cases the jury were to be judges of the law as well as of the fact.

Under our testamentary system, issues may be framed, to be sent by the Orphans' Court to a Court of law for trial by jury.

All these provisions show how carefully the rights of parties in regard to the respective position of Court and jury, were intended to be secured.

It is manifest that where issues of fact are involved, and the right of a party to a trial by jury is insisted upon ; to justify the Court in the exercise of its prerogative, in withdrawing the consideration of the evidence from the jury, when it is competent and admissible, and tends to establish the issue it seeks ; the case should be so barren of proof as to leave no room for doubt or hesitation upon the subject; and if, upon such facts, a jury uninstructed should find a verdict, the Court would *instantaneously* set it aside.

Without meaning to intimate what effect the testimony on the part of the caveators should have had upon the minds of the jury, it certainly occurs to me that if it had been submitted to the jury, without instruction from the Court, and they had found for the caveators upon certain of the issues; it is not such a case, as would have authorized the Court upon that ground to have granted a new trial.

In *Davis vs. Barney*, 2 *G. & J.*, 382, it is announced as the general rule, that where there is any legal admissible evidence, tending to prove the issue, the effect of that evidence is solely for the consideration of the jury.

The Court say, " there seems to be an impression that this Court has held the measure and quantity of proof to be a question of law, and the case of *Davis vs. Davis*, 7 *H. & J.*, 36, is relied upon in support of such doctrine."

" We, by no means mean to shake the authority of that case, but think it has been misunderstood."

" When there is no evidence applicable to the issue, or tending to prove any material fact, a total failure of evidence, the Court will direct the jury accordingly ; and that we conceive to be the doctrine of *Davis vs. Davis*."

" The expressions used are intended to be applicable to the facts of that case ; and so applied they are not opposed

to the principle here asserted, that if there be any evidence tending to the proof of the issue, however weak, it ought to be submitted to the consideration of the jury."

In *Ferguson vs. Tucker*, 2 *H. & G.*, 182, the same doctrine is reiterated; and it is emphatically stated that it by no means follows, even if the verdict would not be satisfactory to the minds of the Court, that they would feel themselves authorized to withdraw from the jury the consideration of the facts—this prerogative of the Court is never exercised, but in cases where the evidence is so indefinite and unsatisfactory, that nothing but wild, irrational conjecture, or licentious speculation, could induce a jury to pronounce the verdict, which is sought at their hands?

In the case of *Cole vs. Hebb*, 7 *G. & J.*, 20, in which the antecedent cases are reviewed, and the doctrine of *Davis vs. Barney*, explained, the conclusion of the Court appears to have resulted in the announcement that evidence offered to a jury, *has a two fold sufficiency*—a sufficiency in law and a sufficiency in fact—its sufficiency in law is for the Court—its sufficiency in fact is a question exclusively for the jury—if, upon the ordinary principles of human judgment, a rational mind could draw from the proof the conclusions sought to be proved by it, then is its legal sufficiency established; and it must be submitted to the jury, who only are the judges of its sufficiency in point of fact.

"Whether the testimony be weak or strong; conclusive or inconclusive; sufficient or insufficient, to prove the facts or warrant the inferences, for the establishment of which it was offered, are questions for the exclusive cognizance of the jury."

As a fair and legitimate criterion of the relative duties of the Court and jury, in doubtful questions, as to the sufficiency of the proof in point of law; the Court further say, the testimony should never be withdrawn from the jury, whose province it is to decide upon its sufficiency in

fact, except in such case, where the Court would *instanta-neously* set aside any verdict founded on its assumed suffi-ciency. The Court, under such circumstances would have to conclude that the jury themselves were totally deficient in a sane comprehension of facts, and the effect of proof.

In the case of *Green vs. Ford*, 35 *Md.*, 82, recognizing the granting or witholding a new trial, as a fair and sensi-ble test as to the nature of the proof and its sufficiency, the Court re-assert the principle, "that however unsatis-factory it may have appeared to the mind of the Court, yet if the jury could reasonably have reached a different conclusion, it should have been considered by them; the Court should not take the case from the consideration of the jury, unless the evidence is so trivial as to admit of no rational conclusion therefrom, applicable to the issue before them—if the Court would have refused a new trial, under such circumstances, it ought not to take the case from the consideration of the jury, upon the ground that no sufficient evidence had been introduced."

Certainly if the question is one of doubt, the Court should not hesitate to refer the facts to the jury.

The danger and difficulty in deciding upon the suffi-ciency of evidence as a matter of law, is that the province of the jury may be invaded, and the rights of litigants unjustly affected.

The tendency of all bodies now-a-days, it seems to me, is too much in the direction of the extension of their own powers; however conservative their inclinations; and this Court as the high and judicial resort in the State, should be careful, as I am sure it is, to guard against encroachment upon the province and rights of others.

Although the question now involved has been repeat-edly discussed, and much perplexity *in the abstract*, has been the result; yet it will be found, by reference to all the cases, that rarely has the prerogative of the Court been exercised; and according to my judgment this case

cannot and ought not to be distinguished, as one where the evidence for the caveators is so trivial, that no sane mind could for a moment entertain a doubt upon the subject, and therefore withdrawn from the consideration of the jury.