( Decided December 11th, 1866.)

---

WILLIAM W. WITTMAN, AND BENENIA A. WITTMAN HIS WIFE, ET AL. *vs.* MARIA R. GOODHAND, ADM'X OF JOHN GOODHAND.

LAST WILL AND TESTAMENT: DURESS: IMPORTUNITY.—In order to invalidate a will on the ground of importunity used in influencing its execution, the importunity must be in such degree as to take away from the testator his free agency.

——: ——: ——: DECLARATIONS OF A TESTATOR made after the execution of a will, such as, "I had to do it, William, to have some peace; if I did not she would worry me to death," supposing them to be admissible, in the absence of other proof of duress, are not sufficient to invalidate a will in face of the fact that the testator was of sound mind and had the power of resisting the importunities made use of.

——, ——: ——: REVOCATIONS OF WILL: DECLARATION OF A TESTATOR made after the execution of a will, that he had "concluded to die without a will," that "the State of Maryland would make a good enough will for him," &c., cannot amount to a revocation of the will, which, under the CODE, ART. 9, SEC. 303, cannot be effected except by writing.

APPEAL from the Orphans' Court of Baltimore city.

This appeal is taken from an order of the Orphans' Court for Baltimore city, passed on the 7th day of September, 1866, declaring valid a paper offered for probate as the last will and testament of John Goodhand, deceased.

The facts of the case are these: John Goodhand, of the city of Baltimore, departed this life on or about the 6th day of April, 1866, intestate, leaving surviving him a widow, Maria R. Goodhand, and four children, viz; Benenia A. Wittman, (wife of said William W. Wittman,) Cornelia F. White, (the wife of Y. T. White,) George W. Goodhand and Emma Ida Isabel Goodhand, the three first named being children by his first wife, and said Emma being the child of said Maria R. Goodhand. On the 2nd of May, 1866, the said Maria R. Goodhand obtained from the Orphans' Court of Baltimore city, letters of administration on the personal estate of said John Goodhand, deceased, and at the time of making said application alleged that said John Goodhand died without a will. And afterwards, to wit, on the 10th of May, 1866, the sister of said Maria R. Goodhand, Emma S. Snead, brought into said Orphans' Court the paper signed John Goodhand, and dated the 10th of January, 1862, alleging that she "found the same in a box, in the house of said deceased, on or about the 8th of May, 1866, and the same was accordingly admitted to probate, whereupon the said William W. Wittman, and Benenia his wife, Y. T. White, and Cornelia his wife, and George W. Goodhand, filed in said Court a petition and caveat, alleging the above facts, and further charging, among other things, that said paper was obtained from said John Goodhand by the exercise of undue influence over him while sick, by the said Maria R. Goodhand, and by the fraudulent devices of said Maria, which the said John Goodhand was incapable of resisting. That she had been expressly directed by said John Good-

hand to destroy the same, and that she had fraudulently concealed the same in a box, and that he died in the belief that his directions had been obeyed, the said paper had been destroyed, and that his property would be distributed according to law, he having expressed his determination to make no distinction between his children in the distribution thereof.

The petition further charges, that said paper is not the last will and testament of said John Goodhand, and prays the Court to set aside said "pretended will," and declare the same null and void.

The answer of appellee denies all these allegations except the first, and this is explained. Her statement is in substance as follows :

The paper in question was executed by the deceased at the time it bears date, out of her presence, and without her knowledge. The deceased delivered it to her in its present shape, executed and witnessed, requesting her to record it if anything occurred to him, meaning in case of his death. She put the paper away ; lost sight of it entirely, until it was accidentally discovered after the death of her husband, and after she had taken out letters on his estate. She had talked with persons who, as she thought, understood the legal effect of the instrument, and from information thus derived, she believed that it could not operate as a will, as it had but one witness. She believes that her husband intended to confer upon her daughter, after his death, the property in said paper named, and that said paper was designed to effect that object. She had lost sight of it and forgotten it, because she had been advised that it had no legal effect. Upon her discovery of it, after her husband's death, and administration on his estate by her, she exhibited the paper to her legal adviser, and was informed by him that the paper was testamentary in its character, and being executed under the circumstances

stated, it was her duty to place the same before the Orphans' Court, and be guided by their directions. That in accordance with this advice, she did place the paper before the Court, and caused the handwriting of the deceased, and of the witness, also deceased, to be proved. In regard to the fifth allegation against her, that her husband had directed her to destroy this paper, &c., she alleges that the conversation with Smith was in reference to another will, which the deceased had executed anterior to the execution of the paper now in question. That this will had been cancelled prior to the execution of the paper in question. That the deceased before that time had erased his own name and the names of all the persons in it, and had given it to her in that condition. That her conversation with Smith had relation to this will, and at once after this conversation this cancelled will was carried by her to her husband who tore it into fragments, and the fragments were burned.

The matter of the said petition was accordingly set down for hearing, and testimony was taken on both sides.

Wesley A. Tucker testified, that in the latter part of 1861, and in the month of January, 1862, said John Goodhand was in declining health, that said John Goodhand told this witness that "he was greatly troubled by his wife in reference to making a will." That "she desired him to make some separate provision for her daughter, Ida;" and that towards the close of 1862, he told witness "that he had made a will for the purpose of making peace with his wife." "That if the good Lord would deliver him from this marriage, he would never marry again." That she, the said Maria, endeavored to persuade witness "to use his influence upon her husband to cause him to make a separate provision for the youngest child, Ida." That in March, 1866, said Goodhand told witness that "he had concluded to die without a will." That the "State of

Maryland would make a good enough will for him;" that "he wanted to make no difference between his children," and that his wife was present when he so said. That witness never heard said John Goodhand speak of any other paper in the nature of a will ; that he believed the paper in question was the one that said John Goodhand referred to when he said in 1862, that he had to make a will for the purpose of making peace with his wife. Witness also testified, that said Maria told witness that unless said John Goodhand did make some provision for her that she would be left without support.

Henry C. Smith testified, that said John Goodhand never spoke to him of any other paper but the will made in 1862, and on the cross-examination of this witness, although a strong effort was made to get him to change the date, it will be seen that he insisted that the year was 1862. He further testified, that in 1864 or 1865, said John Goodhand called on him and said, that "he was in a great deal of trouble ;" "that the old woman (said Maria) was raising the devil at home." "That she demanded six hundred dollars"—"that he had not that sum, and that he did not know what to do about it ;" and that he, said John Goodhand, said to witness, "I have no peace at home or comfort of my life—I have but a short time to live, you know my health is very bad, and is not my peace worth more than six hundred dollars?" That witness loaned said John Goodhand $600. That to "purchase peace" was the object that he said he wanted it for. He further testified, that in the presence and hearing of the said Maria, he (said John Goodhand) expressed his determination to die without a will, and that he wished to make no distinction in the distribution of his estate between his children. She desired this witness to see said John Goodhand and "persuade him to make some such provision for this child, Ida." He further testified, that during this conversation, Mrs. Good-

hand said there was one matter troubled her. That "Mr. Goodhand, you know, made a will," and that witness answered, "yes, in 1862, but that will is destroyed." She said he had told her to destroy it, and placed it ( that is, the will of 1862,) in her hands for its destruction, but that she had failed to do it, she had not done it—she did not know what might "turn up ; what might occur."

William W. Wittman also testified, that said John Goodhand stood in fear of said Maria, and that he told him that he "had" to make the memorandum or paper in question "to have some peace," which he repeated to this witness on several occasions, for she would have "worried him to death if he had not done it." That this witness "heard him say a short time before he died—he was scarcely able to talk then—I was leaning over his bed—that if he was only a thousand miles away he could live or die in peace."

Maria R. Goodhand testified, that she laid aside this paper "like she would any other letter, and took no particular account of it."

Emma Snead testified, that she found the little strip of paper in question in a box ; "I opened it and carried it down to my sister ; I told her that there was a piece of paper that I saw Ida's name in, and commenced to read it, and I did not finish, and went down stairs and gave it to her." That witness then left the room and went to packing.

The Court afterwards filed two orders, one dated July 13th, 1866, and the other the 7th of September, 1866, rescinding the first order, and pronouncing said paper a valid will and dismissing said petition ; from which last order, excepting so much thereof as rescinds the first order, the caveators appealed.

Wittman and Wife et al. *vs.* Goodhand, Adm'x, &c.

The cause was argued before BOWIE, C. J., BARTOL, COCHRAN and WEISEL, J.

*T. B. Horwitz* for the appellants argued:

1st. That the paper writing admitted to probate as the last will and testament of John Goodhand, deceased, was obtained by undue influence exercised over him, and is therefore void.

"A testator should enjoy full liberty and freedom in the making of his will, and possess the power to withstand all contradiction and control." 1 *Swinbourne on Wills*, 22. "That degree, therefore, of importunity or undue influence which deprives a testator of his free agency, which is such as he is too weak to resist, and render the instrument not his free and unconstrained act, is sufficient to invalidate it." *Kirloside vs. Harrison*, 1 *Eng. Eccles. Rep.*, 336. *Davis vs. Calvert*, 5 *G. & J.*, 301, 302. *Wampler vs. Wampler*, 9 *Md. Rep.*, 551.

2nd. That the paper writing, so obtained by undue influence, is void, "not in relation to the person alone by whom it is procured, but as to all others who are so intended to be benefitted by his undue influence." *Davis vs. Calvert*, 5 *G. & J.*, 302.

3rd. That the paper writing in question was fraudulently concealed by said Maria R. Goodhand after she was directed by said John Goodhand to destroy the same, and is therefore inoperative as a will and void. *Davis vs. Calvert*, 5 *G. & J.*, 303.

4th. That said paper writing was obtained by fraud, and is therefore void. *Davis vs. Calvert*, 5 *G. & J.*, 303.

*Wm. S. Waters* for the appellee.

The petitioner's answer and evidence raise the following questions:

1. Is the paper in question testamentary in its character? Its execution is conceded.

2. Was it obtained by undue influence or fraud?

3. Has it been revoked?

*First.* Is the paper testamentary in its character?

The petition concedes, that the paper is the will of the deceased, but that it was obtained improperly, and was directed to be cancelled. It is proved that in 1862, he declared he had made a will precisely of this character. The paper in question was not only intended, in fact, as a will of the deceased, but independent of this specific intention, it was his obvious purpose that this paper should take effect after his death, and that is sufficient to make it a testamentary paper. *Carey et al. vs. Dennis et ux.*, 13 *Md. Rep.*, 1.

*Second.* The next question is, was this paper obtained by undue influence or fraud?

Mrs. Goodhand says, she knew nothing of it until delivered to her by deceased. It is then executed and witnessed.

Tucker and Smith both say, that he declared his intention to make just such a will, before it was made, and declared after it was made that he had done so. Goodhand informed members of his family generally of it.

The deceased was a business man, and a man of sound health, mind and judgment when the act was done. Let it be admitted that his wife was a termagant, that she did worry him, and that he was induced to make the will to please her, does all this amount to undue influence? Fraud there is none.

1st. The importunity and undue influence, to vitiate the instrument, must be such as deprives the party of free agency, such as he is too weak to resist. 5 *Gill & Johns.*, 302. 18 *Eng. L. & E. Rep.*, 578, 579, 583, 589, 585, 591, 592, 595, 596. 3 *Searg. & Rawle*, 267. 3 *Wharton.*

2nd. It is proved that Maria R. Goodhand had not control to this extent. She could not control her husband, unless his will agreed with hers. See the resistance he made to her importunity on his death bed.

3rd. A wife is allowed to have influence over her husband in making his will, and such influence is proper. In this case, the purpose she had in view was just in itself. The other children were raised, and her daughter could not be made equal with them, unless by a will of this sort. 18 *Eng. L. & E. Rep.*, 516.

4th. There is no instance of undue influence setting aside a will, where the testator's mind was free from infirmity. 18 *Eng. L. & E. Rep.*, 583, 589, 596.

5th. The writing in question was not made under the instructions of Maria R. Goodhand. It was displeasing to her, and it is alleged that she constantly urged him to make a new will.

6th. The deceased declared, before the making of the will, that he intended to make it, showing that his will, from whatever motive, was to make it.

*Third.* Did the will in question remain unrevoked at the time of the testator's death?

No declarations on the part of John Goodhand, that he had destroyed the will, or that he had no will, or admissions on the part of Maria R. Goodhand, that she had been ordered to destroy it, or any verbal statements on the part of either of them, can render the will ineffectual. *Code, Art.* 93, *sec.* 303. 4 *H. & J.*, 142.

1st. It is not a fact, that the testator ordered it to be destroyed, or that Maria R. Goodhand admitted that she had been ordered to destroy it. All these matters are fully explained in the testimony.

2nd. The acts of Mrs. Goodhand, or her opinions, could not set aside the instrument, and deprive her daughter of benefits under it. No fraud on her part has been shown

in reference to its non-production. The testimony sets her conduct in proper light in reference to all this.

BARTOL, J., delivered the opinion of this Court.

The paper exhibited as the last will of John Goodhand, deceased, was executed and attested in such form as to pass personal estate, and the property therein named being leasehold will pass under it, unless the caveat of the appellants be sustained.

The execution of the paper is not denied, but the objections to its validity, relied on by the appellants, are:

First. That it was obtained by undue influence exercised over the testator by the appellee, who was his wife.

Second. That it was obtained by fraud.

Third. That the paper was fraudulently concealed by the appellee after she had been directed by her husband to destroy it, and is therefore inoperative as a will and void.

1st. As to the alleged undue influence: The proof shows, that at the time of executing the will, the testator was of sound mind, and though not in robust health, was far from being in a weak or enfeebled condition.

The paper does not appear to have been executed in the presence of his wife,—Mrs. Goodhand, the appellee, is the only witness who speaks on this point; she states that she knew nothing of the execution of the paper until it was handed to her by him signed and attested.

Both the witnesses, Tucker and Smith, who were called to support the caveat, state that the deceased declared to them his intention to make such a will, and informed them afterwards that he had done so. These witnesses state, that he said to them, in 1861, "he was greatly troubled by his wife in reference to making a will, that she desired him to make provision for her daughter, Ida." But there is no evidence of any such undue influence exercised over him

in procuring the execution of the paper as would render it invalid.

In *Davis vs. Calvert*, 5 *G. & J.*, 302, it is said : "That degree, therefore, of importunity or undue influence which deprives a testator of his free agency, which is such as he is too weak to resist, and will render the instrument not his free and unconstrained act, is sufficient to invalidate it."

Sir JOHN NICHOLL, in the case of *Kingleside vs. Harrison*, 2 *Phillimore*, 551, observed, "that importunity, in its correct legal acceptation, must be in such a degree as to take away from the testator his free agency."

This record certainly furnishes no evidence of any such importunity or undue influence in procuring the execution of this will.

On this point, the testimony of Wittman, one of the caveators, has been chiefly relied on in the argument. He states that Goodhand, after the execution of the will, told him what he had done, and said : "I had to do it, William, to have some peace ; if I did not she would worry me to death." This testimony is excepted to on the ground that the verbal declarations of a testator, made after the execution of a will, are inadmissible to impeach its validity, and authorities have been cited in support of this position.

Without expressing any opinion on this point, which it is unnecessary for us now to decide,—in our judgment, the declarations of the testator made to Wittman, even supposing them to be legally admissible, are not sufficient, in the absence of other proof of duress, to invalidate the will in the face of the fact that the testator was of sound mind, and that he had the power of resisting the importunities of his wife, as is shown by the other evidence in the cause.

The second ground of objection, that the execution of the will was procured by fraud, is without any proof to support it.

Third. The allegation that this will was fraudulently

kept concealed by the appellee, after the testator had directed her to destroy it, and that he died in the belief that it had been destroyed, rests upon the testimony of the witnesses Wesley A. Tucker and Henry C. Smith. This testimony consists of the declarations made by the testator in the latter part of 1865 and early in 1866; and also of the declarations of the appellee made about that time.

As to the declarations of the testator, it is clear that they could not amount to a revocation of the will, which, under the Code, Art. 93, sec. 303, could not be effected except by writing.

Both these witnesses state that the appellee, in 1865, spoke as if there was no will in existence, and endeavored to persuade them to prevail on her husband to make a will in favor of her daughter, Ida. But this is explained by the fact that she considered the memorandum of the 10th of January, 1862, as inoperative as a will, and it is possible the testator was of the same opinion.

The witness, Smith, states that Mrs. Goodhand, in January, 1866, told him her husband had made a will and had directed her to destroy it, which she had neglected to do, and was troubled in consequence. And the inference of the witness was that she referred to the memorandum of the 10th of January, 1862. It appears, however, by the testimony of Mrs. Goodhand, Miss Sarah Snead and George H. Crane, that there was another will, a more formal paper, which had been executed by the deceased, and which was destroyed by him in February, 1866. This evidence explains the meaning of Mrs. Goodhand's conversation with Smith, and effectually rebuts the inference that they referred to the memorandum of January, 1862. This paper having been executed by the testator freely, without duress or undue importunity or fraud, and remaining unrevoked, was properly admitted to probate by the Orphans' Court.

The order appealed from will therefore be affirmed with costs to the appellee.

*Order affirmed.*

(Decided December 20th, 1866.)