ELIZABETH GUNTHER *vs.* HENRY GUNTHER, and others.

*Bill to   Vacate' a  Deed—Mental  incapacity—Fraud— Undue
influence.*

Five days before his death the decedent, a man of strong and de-
termined will, about sixty-two years of age, and not shown to
be wanting in mental capacity, executed a deed which was pre-
pared some weeks before, conveying to his wife by a third
marriage the bulk of his property, giving as one of the reasons
that induced him to make it, that she had materially aided him
by her thrift, energy and industry in making and saving what he
possessed.  A will containing substantially the same provisions
in favor of his wife and their children, but containing also
legacies to children by a former wife, which he afterwards modified
by codicil, in respect of three of them, was made six years be-
fore.   Another reason expressed for giving the deed was to avoid
the expenses incident to his estate passing through the Orphans'
Court.  His wife acted as his book-keeper and aided him in his
business; she was kind and exercised great influence over him,
but there was no evidence to show that she even suggested the
preparation of the deed.  His property was accumulated during
their marriage.  The decedent had materially assisted the child-
ren by his former marriage, but three of them had proved un-
grateful and treated him badly.  On a bill filed against his widow
by these three children to set aside the deed on the ground of
mental incapacity, fraud, and undue influence, it was HELD :

That there was no evidence to show mental incapacity when the
deed was signed, or anything approaching fraud or undue in-
fluence on the part of the widow.

APPEAL from the Circuit Court for Baltimore County,
in Equity.

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., MILLER,
ROBINSON, IRVING, and McSHERRY, J.

Gunther *vs.* Gunther.

*Skipwith Wilmer*, and *Randolph Barton*, for the appellant.

The following authorities would seem to discuss the questions of law that are involved in this case: 1 *Jarman on Wills*, (*Am. Ed.*,) *p.* 134, *note on top of page; Griffith vs. Diffenderffer*, 50 *Md.*, 468; *Higgins vs. Carlton*, 28 *Md.*, 125, 13*th prayer; Layman vs. Conrey*, 60 *Md.*, 292; *Stirling vs. Stirling*, 64 *Md.*, 151; *Tyson vs. Tyson*, 37 *Md.*, 582, 583, 588; *Wittman vs. Goodhand*, 26 *Md.*, 95, 104, 105; *Kinleside vs. Harrison*, 2 *Phillimore*, 551; *Lovett vs. Lovett*, 1 *Fost. & Fin.*, 581, 582, 583; *Earl of Sefton vs. Hopwood*, 1 *Fost. & Fin.*, 578; *Stulz vs. Schoeffle*, 18 *Eng. Law and Eq.*, 576, 579, 597, 598; *Parfit vs. Lawless*, 27 *Law Times, N. S.*, 217, 218; 1 *Redfield on Wills*, (*star paging*,) 516, 517; *Davis vs. Calvert*, 5 *G. & J.*, 269; 6 *H. L.*, 51; *Groff vs. Rohrer*, 35 *Md.*, 327; *Todd vs. Grove*, 33 *Md.*, 188. As to mental capacity, see *Higgins vs. Carlton*, 28 *Md.*, 137; *Waters vs. Waters*, 35 *Md.*, 531; and as to fraud and undue influence, see *Cherbonnier vs. Evitts*, 56 *Md.*, 276.

The burden is upon the plaintiffs to show that the deed was procured by fraud or undue influence. *Griffith vs. Diffenderffer*, 50 *Md.*, 468.

Influence which will avoid the deed must be exerted to such a degree as to amount to force or coercion, destroying free agency; it must not be the influence of affection or attachment, nor the mere desire of gratifying the wishes of another, for that would be a very strong ground in favor of a testamentary act; and there must be satisfactory proof that the deed was obtained by this coercion, or by importunities which could not be resisted, so that the motive was tantamount to force or fear. *Higgins vs. Carlton*, 28 *Md.*, 125; *Layman vs. Conrey*, 60 *Md.*, 292; *Wittman vs. Goodhand*, 26 *Md.*, 95.

The testamentary capacity, however, involves more than the mere fact of recognizing familiar persons or objects, and means a sound disposing mind; that is to say, a power of understanding the nature of the property, and the family, and the effect of the will. *Earl of Sefton, &c. vs. Hopwood,* 1 *Fost. & Fin.,* 578.

Undue influence to defeat a will made by a person otherwise of testamentary capacity, must not be such as arises from the influence of gratitude, affection or esteem, but it must be the control of another will, that of the testator, whose faculties have been so impaired as to submit to that control, so that he has ceased to be a free agent, and has quite succumbed to the power of the controlling will. *Lovett vs. Lovett,* 1 *Fost. & Fin.,* 581.

. Provision made for a wife is very different from a voluntary deed of a stranger. *Groff vs. Rohrer,* 35 *Md.,* 336; *Conley vs. Nailor,* 118 *U. S.,* 127.

A wife is allowed to have influence over her husband in making his will, and such influence is proper. In this case, even assuming that she requested her husband to make the will and deed, the purpose she had in view was just in itself. The other children were raised, and her own children could not be made equal with them, unless by a will of this sort. 18 *Eng. L. & E. Reps.,* 516.

"The undue influence for which a will or deed will be annulled, must be such that the party making it has no free will, but stands *in vinculis.*" *Allison vs. Ward,* 5 *West. Rep.,* 730; *Hewitt's Appeal,* 55 *Md.,* 509.

*William S. Bryan, Jr.,* for the appellees.

Upon the facts of the case, the deed in question is presumptively invalid, for the reason that at the time of the making of the deed the donee stood in a confidential or fiduciary relation to the donor, and there-

fore, the burden is thrown on the donee to establish to the satisfaction of the Court that it was the free, voluntary and unbiased act of the donor. Confidential or fiduciary relations may exist as well between husband and wife as between strangers. "It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists *as a fact* in which there is confidence reposed on one side, and the resulting superiority and influence on the other. The relation and the duties involved in it need not be legal; it may be moral, social, *domestic*, or merely personal." The principle is one of universal application, and the cases in which the jurisdiction has been usually exercised—those of trustee and *cestui que trust*, guardian and ward, attorney and client, &c., are merely instances of the application of the principle. The antecedent relation of confidence or trust being first established *as a fact*, the Court will *presume* the instrument *prima facie* void. 2 *Pom. Eq. Jurisp.*, *secs.* 955 *to* 958, *pages* 477–481, *and notes there referred to; May on Fraud. Convey.*, *pages* 494–505, (2*d Eng. Ed.*); *Price vs. Price*, 1 *DeGex, M. & G.*, 308; *Todd vs. Grove*, 33 *Md.*, 193–195.

McSHERRY, J., delivered the opinion of the Court.

Henry Gunther, now deceased, had been married three times. By his first wife he had several children, four of whom survived him; by his second he had none; and by his third he had four, all of whom, together with their mother, are now living. He died on the eighth day of August, eighteen hundred and eighty-six, aged about sixty-two years. Five days before his death he executed a deed conveying to his wife, the appellant, all his property, except his North Point farm. Some months after he died three of his children by his first wife filed a bill against the appellant, on

the equity side of the Circuit Court for Baltimore County, assailing that deed upon the ground that Gunther was of unsound mind when it was made, and upon the further ground that it was obtained by the fraud and undue influence of his wife, the grantee.   All of this is emphatically denied by her in her answer. The Circuit Court passed a decree annulling the deed and from that decree this appeal has been taken.

There is not the slightest semblance of evidence in the record to show want of mental capacity on the part of Gunther when he signed the deed.. In fact, the exceedingly able argument pressed upon us by the appellees' counsel was chiefly confined to the question of undue influence ; and upon that question the evidence is quite voluminous, and in some particulars very conflicting.

In the leading case of *Davis vs. Calvert,* 5 *G. & J.,* 269, the law on this subject is stated thus:   "Nor is it every degree of importunity that is sufficient to invalidate a will or testament.   Honest and moderate intercession or persuasion, or flattery unaccompanied by fraud or deceit, and where the testator has not been threatened or put in fear by the flatterer or persuader, or his power or dominion over him, will not have that effect."   "That degree therefore of importunity or undue influence which deprives a testator of his free agency; which is such as he is too weak to resist, and will render the instrument not his free and unconstrained act, is sufficient to invalidate it."   The influence of affection or attachment or the mere desire of gratifying the wishes of another is not sufficient; but there must be satisfactory proof that the instrument was obtained by influence exerted to such a degree as to amount to force, or coercion, or by importunities which could not be resisted, so that the motive was tantamount to force or fear.   *Higgins vs. Carlton,* 28

Gunther *vs.* Gunther.

*Md.*, 125. This is the settled law of Maryland reiterated and applied in numerous decided cases. *Wittman vs. Goodhand*, 26 *Md.*, 95; *Tyson vs. Tyson*, 37 *Md.*, 582; *Layman vs. Conrey, &c.*, 60 *Md.*, 292; *Stirling vs. Stirling*, 64 *Md.*, 138.

Henry Gunther married the appellant in eighteen hundred and sixty-eight. He was then forty-four years of age, and she was twenty-three. At that time he carried on a beer saloon and kept boarders. A house, the only property he owned, had two mortgages upon it. Within two years after this marriage he had saved a small sum of money with which he purchased a milk route. His wife became his book-keeper, and aided him in his business. He seems to have prospered from that time. He extended his occupations, becoming a stevedore, contractor and road supervisor; and at his death he left an estate of something over seventeen thousand dollars in value, besides life insurance policies in favor of his wife for about five thousand dollars. This property was accumulated during the eighteen years he was married to the appellant, and the testimony leaves no room to doubt that she materially aided him by her thrift, energy and industry in making and saving what he possessed. Indeed, he frankly admitted this to the Rev. Dr. Swartz and to Mr. Smith, the attorney, whom he employed to prepare the deed, and to whom he stated this as one of the reasons which induced him to make it, adding, as if by way of emphasis, that "he would like to have it fixed so that she would not have any trouble about it if anything should happen to him." He did not forget the claims which his children by the first marriage had upon him. They lived with him during the greater part of their minority. He assisted his son, Henry, one of the plaintiffs, in various ways, but particularly by the loan of money to a considerable amount, much of which was lost. He

aided Baumgartner, the husband of his daughter Mary (another of the plaintiffs) to engage in business; and after Baumgartner had committed suicide, and the business became a wreck, he continued to assist her until her grossly immoral conduct estranged him from her. As far back as eighteen hundred and eighty-two his other daughter, Louisa, the remaining plaintiff, by procuring his arrest, without just or probable cause, convinced him of her utter want of filial duty and affection. He complained of the bad treatment he had received from these three children, and stated to some of the disinterested witnesses "that he had already helped them enough, if they had taken care of what he had given them."

The eldest of his children, by the first wife, when the deed was made, was forty-one years, and the youngest, Mary Baumgartner, was twenty-seven years. The eldest of those by his last wife was fifteen years, and the youngest was but eight months old.

When the deed was actually executed he appeared to be much prostrated physically, but he signed it himself with a bold and steady hand, and without leaving on the face of the paper the faintest trace of bodily weakness, as the original instrument clearly shows. Its execution was the consummation of a fixed and settled purpose, formed after mature deliberation; and the disposition made by it was one he had adhered to, though in the form of a will it is true, for many years. It is abundantly proved that he was a man of strong and determined will, who would brook no opposition from any one; or as expressed by Mr. Schone, one of the witnesses, "I think he was one of the strongest willed men I ever met, his mind was strong too; if he promised you anything, you could depend on it." He retained this characteristic when he signed the deed, and for at least three days afterwards, as the testimony

of the Rev. Dr. Swartz conclusively establishes. We are told by Mr. Donnelly, whose testimony bears throughout an unmistakable impress of robust frankness, that his, Gunther's, mental condition, on the night preceding the execution of the deed, "appeared to be as strong as ever it was."

Six years before the date of the deed we find this strong-willed man, without, so far as the record discloses, his wife even suggesting it, making a will which was prepared by the same magistrate who took the acknowledgment to the deed. The provisions of that will are very significant. It bequeaths to his son, Henry, $800.00 to be paid out of the North Point farm; it devises to Frederick (who is not a party to this case nor a witness in it) all the rest of the North Point farm; it bequeaths to his daughter Louisa $500.00, and to his daughter Mary Baumgartner $1000.00, "provided, however, if there be any money due me from her or from her husband at the time of my decease, then the same shall be deducted from the * * * $1000.00;" it devises to his wife a house on the corner of Fifth Avenue and 14th Street, Canton, house on Chesapeake Street, dwelling house and tavern, two store houses, blacksmith shop and wheel-wright shop, all his live stock, horses, and cows, harness and vehicles, stock in trade, household and kitchen furniture. "I do also give and bequeath to her, my said wife, all the residue of my estate * * * the same to have and to her, my said wife, * * * for her use and for the benefit of my minor children, Dena, Annie, and Charles, now living, and for those that may yet be born to me; each of my said minor children to share and share alike in said benefits * * * ."

After the efforts which he made to establish some of the plaintiffs in business had failed, he added a codicil to his will reducing the amounts bequeathed to these

three children, who are the plaintiffs in this cause, but leaving undisturbed the other provisions we have alluded to.

By this will and codicil he gave to his wife and her children exactly the same property which he subsequently granted to the wife alone by the deed in question. The deed, therefore, made no disposition of his property practically or substantially different from that made by the will. They both speak the same intention. There was, in fact, no necessity for the execution of the deed; but one of the reasons assigned by him for making it becomes of much importance as showing all absence of undue influence. Having executed this will with all due formality, at a time when, from aught that appears to the contrary in the record, he was of perfectly sound and disposing mind; and wholly free from any sort of influence, we find Henry Gunther something more than a month prior to his death consulting Dorsey, the magistrate, "in reference to making a deed" and "stating that he thought it would be better to make a deed of all his property except the farm," and asking Dorsey "if it was" his, Dorsey's, "opinion that it would save the trouble of having his property taken to the Orphans' Court." Dorsey told him he thought it would. After several interviews with Dorsey upon this subject, Gunther went alone to the office of Mr. Smith and spoke to him "about the preparation of this deed; he said that he had been considering the matter for sometime, and had spoken to Justice Dorsey about preparing the deed, but that he was then having some trouble with some paper that Justice Dorsey had prepared for him and that he preferred that some one else should prepare this deed." Subsequently he gave the witness the particulars, and told him "that he wanted to convey everything that he possessed to his wife, except the North

Point farm, where his son Frederick resided, and that he wanted to convey to Frederick charged with the payment of certain amounts * * * * to his other three children by his first wife." Thus his design clearly was to dispose of all his property by deeds to the persons to whom, and substantially in the manner or proportions in which, he had given it by his will and codicil; and his avowed purpose in making the deed was merely to avoid the expenses incident to his estate passing through the Orphans' Court.

Here, then, is the case of a man of vigorous will and strong determination, but physically weak, deliberately, not hastily, executing a deed which is intended to make substantially the same provision for his wife that a will of six years standing had actually done. The reasons for his discriminating against three of his first children—if discrimination it may be called—were ample, and were fully explained by him; whilst the motives which prompted his solicitude for the appellant and her offspring were intelligent, commendable and just.

In the face of this the appellees, who attack this deed, and upon whom, therefore, the burden of proof rests to show that it was obtained by that character of undue influence defined by the adjudged cases to which we have referred, present the most inconclusive and unsatisfactory evidence. They have proved that Mrs. Gunther treated her husband with great kindness, and with unremitting attention to his wants and comfort: That he confided in her, left much of his business to her management, and trusted her with large sums of money to expend in paying his employés; but they have not shown that she used any threat, violence, flattery, persuasion, force, or coercion, or other improper means to procure the execution of the deed in question. In fact, they have failed to show even that she sug-

gested its preparation; and they have adduced no evidence whatever from which it can reasonably and fairly be inferred that the deed was not the voluntary prompting of Gunther's own unbiased mind. They have proved that "if she wanted anything, and said, papa do this or that, he always did it;" that when he was not intoxicated she "could control him to a certain extent;" and another witness says to a "full extent, because she was good to him, and she could do anything in the world with him." Even if we were satisfied that this deed was procured by the exertion of such influence as this, we would, if we were to set it aside therefor, thereby discountenance the legitimate influence which a wife may validly exercise over her husband, and we would depart widely from every ruled case upon this subject in Maryland.

The appellees have also proved that after Gunther was confined to his room, Mrs. Gunther refused to allow the plaintiffs to see him until he became speechless. This is flatly denied by her. But whether it be true or not, it is not in the least material, inasmuch as he was confined to his room for only a few days before the deed was signed, and the appellees had ample opportunity to see him, had they desired to, either when he sat upon his pavement, (as he was in the habit of doing,) or when he was going about looking after his work, during all the interval which elapsed between the time when the deed was prepared by Mr. Smith, and the few days immediately preceding its execution. Before he took to his bed his mind had been made up to execute it, and the unsigned instrument remained in his safe for some weeks. The appellees were not defeated in any attempt to prevent its execution, because it is not pretended that they had the slightest intimation of his intention to make it.

There has been nothing satisfactorily proved by the appellees which questions in the least the perfect

Gunther *vs.* Gunther.

integrity of Mrs. Gunther in this matter; and Mr. Schone, who has not the most remote interest in the controversy, emphatically swears that he "always found Mrs. Gunther to be a kind, affectionate wife to the family, a hard-working, industrious woman." The trustworthy and probable portion of the evidence adduced by the appellees falls, in our opinion, very far short of showing any thing approaching fraud or undue influence on the part of Mrs. Gunther; and it is simply incredible that a self-willed and self-reliant man like Gunther undoubtedly was, would have surrendered (as loose statements of some of the witnesses imply that he did) all dominion and control over his property and his power to deal with it as he might see fit, merely to purchase peace and quiet in his household.

We have given to the case careful thought and reflection, and we are driven to the conclusion that an affirmance of the decree appealed from would utterly frustrate and strike down the deliberate intentions of Henry Gunther, formed and carried into effect by him voluntarily, and when in the full possession of all his mental faculties. The decree of the Circuit Court for Baltimore County must therefore be reversed, and the bill must be dismissed with costs.

*Decree reversed, and*
*bill dismissed.*