# CIRCUIT COURT NO. 2 OF BALTIMORE CITY.

Filed March 8, 1897.

FANNIE BRENGAL FRUSH

VS.

CHARLES FERDINAND GREEN, ET AL.

*Fielder C. Slingluff* and *Thomas R. Clendinen* for plaintiff.

*Robert H. Smith, James W. Denny* and *Thomas M. Lanahan* for defendants.

## STOCKBRIDGE, J.—

Luther M. Frush, an unmarried man, resided for a number of years on Madison avenue in this city. The members of his household were, a sister, Mrs. Leas; the widow of a deceased brother, Mrs. Sarah Frush; and her daughter and his niece, Miss Fannie B. Frush. Mrs. S. Frush acted as housekeeper, doing the marketing and attending to the care of the house, the expense being borne by Mr. Luther M. Frush. In her work Mrs. Frush was assisted to some extent by her daughter and Mrs. Leas. Mr. Frush also had a sister Mrs. Robert Green, with whom for a number of years he had not been on good terms, and this feeling of estrangement appears also to have extended to some of Mrs. Green's eight children, while with respect to the others the same amount of irritation does not seem to have existed, though there was nothing that could be called intimacy between Mr. Frush and any of Mrs. Green's children. There were also the children of a deceased brother, but with none of these did Mr. Frush appear to have been on good terms.

Mr. Frush appears from the testimony to have been what is generally termed an eccentric man, and was also "close," if not miserly as well.

In the latter part of 1894 he was somewhat ill, and more pronouncedly so in January, 1895, with what was probably the commencement of the disease which finally resulted in his death, cancer of the bladder. He recovered in a measure from these attacks and in April went to Atlantic City, accompanied by Mrs. Sarah Frush. The expected benefit did not result and after a short stay he returned to Baltimore. During May, under the advice of the physician that he be kept in the open air as much as possible, he took frequent rides on the street cars accompanied by either Mrs. Frush or Mrs. Leas, and on one of these rides in the latter part of May stopped at the house of Mrs. George A. Horner at Walbrook, Mrs. Horner being a daughter of his sister, Mrs. Green. Feeling that he was relieved by being away from the city proper, he accepted an invitation to remain there over night, and at once expressed a desire to procure a house in the country for the summer, which resulted in the renting of a cottage on the Pimlico road, into which he, Mrs. Frush, Miss Frush and Mrs. Leas moved on the 7th or 8th of June. While there he was visited by Mr. and Mrs. Horner, with whom he had stayed at Walbrook, and other members of the Green family, the Walbrook visit apparently having, to a considerable degree, obliterated the former unfriendly feeling between him and his sister, Mrs. Green and her children. While suffering a good deal of pain, he was up and about the house and grounds on the Pimlico road till the 6th of July, and on that day gave his attention to some small matters of business. On the afternoon of that day he received a call from Mr. George A. Horner, to whom he gave directions for the preparation of a deed of trust of his property, which was to operate practically as a will. Under these instructions all his property was to be conveyed to Mr. Horner as trustee, reserving the net inome to himself for life, and thereafter directing the payment of $2,000 to Mrs. Sarah Frush, $3,000 to a Miss Dotterwich, giving his ground rents to his sister, Mrs. Leas, a piano to his niece, Miss Fanny Frush, and all the remainder of his property to four named children of his sister, Mrs. Green.

These instructions were transmitted on the morning of the Monday following, July 8th, to Mr. W. T. Donaldson, who had for some time been Mr. Frush's counsel. For reasons which he gives in his testimony, before preparing the deed, Mr. Donaldson went out to see and did see Mr. Frush, and was told by him to do as he had been instructed by Mr. Horner. The deed was accordingly prepared and executed that same afternoon in the presence of Mr. Donaldson, Mr. Horner and Mr. Reardon, the magistrate taken out by Mr. Donaldson. Five days later, on July 13th, Mr. Frush died, and on the 18th of July the bill in this case was filed by Miss Fanny B. Frush to have the deed declared null and void upon the usual grounds of undue influence and mental incapacity.

An unusually large amount of testimony has been taken, and the case argued with signal ability upon both

sides. As almost always occurs when the issues are fraud, undue influence and mental incapacity, the testimony abounds in irreconcilable conflicts and contradictions, and the weighing of it, and its relative importance, imposes a task of peculiar responsibility upon the Court.

There has been much contention as to where the burden of proof rests, and the doctrine of confidential relations has been invoked to cast upon the defendants the onus of proving that the execution of the deed was the free, voluntary act of Mr. Frush. But this is not the case of a deed from child to parent, as in Williams vs. Williams (63 Md. 371), or of ward to guardian, as in Whitridge vs. Whitridge (76 Md. 75), or of one brother to another, as in Todd vs. Grove (33 Md. 188). It is a deed from a man to one who was a comparative stranger; the husband of his niece, it is true, but not residing in the same house with him, and with whom he had hardly any relations whatever up to within less than a month and a half before the execution of the deed. In such a case the doctrine of confidential relations cannot be applied so as to impose the burden of proof on the defendants.

Was Mr. Luther Frush unduly influenced in the execution of this deed?

In order to invalidate the deed upon this ground the influence must be such as deprives the maker of his free agency and subordinates his will to that of another, thus making the deed not the act of the grantor but that of the person exercising the dominion or control over him.

Tyson et al. vs. Tyson et al., 37 Md. 582.

Grove vs. Spiker, 72 Md. 301.

While some of the cases go so far as to say that the influence to be what the law regards as undue, must amount to coercion or importunities which could not be resisted so that the motive was tantamount to force or fear. Layman vs. Conrey. 60 Md. 293; Gunther vs. Gunther, 69 Md. 564; Davis vs. Calvert, 5 G. & J. 269.

Just what may legitimately be brought to bear upon the mind of the testator to influence the making of a will in a particular way, and at what precise point such influence becomes what the law denominates undue, such

as to avoid the testamentary act is oftentimes not easy to determine, but that something further than the mere making of a will, that is apparently unfair or unjust, must be shown and proven, is a question about which there is no doubt or uncertainty. Affirmative proof of such undue influence is required to be made either of direct facts shown, or of facts and circumstances from which undue influence results as a reasonable and fair inference, and not as a mere conjecture.

Doherty vs. Gilmore, 37 S. W. Rep. 1127, Sup. Ct. No. decided 16 Dec. 1896.

Measured by any or all of these standards there is no direct proof of such importunity or coercion as would warrant the conclusion that at the time the deed was executed Mr. Frush was so under the dominion and control of any one or all of the defendants, as to destroy his free agency and subordinate his will to that of another. But three persons appear to have volunteered advice to him with regard to the disposition of his property; his attorney, Mr. Donaldson; his physician, Dr. Bevan and his sister, Mrs. Leas, and each apparently in turn was made to feel that their advice was in no way wanted. Are there any facts and circumstances from which such undue influence is properly to be inferred? The opportunity for the exerting of undue influence must of course exist, but the fact of its existence raises no presumption that it has been exercised. It is not every degree of importunity or influence that is sufficient to invalidate a deed or will. Honest and moderate intercession or persuasion or flattery even, unaccompanied by fraud or deceit, and where he on whom it is practiced has not been threatened or persuaded, or his power or dominion over him, will not have that effect. So while the evidence tends to show that flattery and attentions amounting to fondling and caressing were bestowed upon Mr. Frush by the defendant, George A. Horner, it does not appear to have gained for Mr. Horner that power or dominion which would make his influence controlling. unless it be assumed that it was at his. Horner's, instance, that Miss Fanny Frush was practically ignored in the deed, and for this assumption there is no evidence whatever; indeed, the evidence points to directly the opposite. Another circumstance from

which undue influence is sometimes inferred, is where the deed or will is at variance with the known settled purposes of the grantor's or testator's life. Many witnesses were examined with a view to show, and much stress was laid in the argument upon the extremely kindly feeling that existed between Mr. Frush and his niece, Miss Fanny, and that he regarded her almost as his own child, and that he cherished the purpose of leaving her a considerable amount of his property. A careful sifting of the testimony shows, as a concession by all parties to this case, that though Mr. Frush and his niece lived under the same roof for a number of years, he never made her any present of value, and that when on one occasion he did take her to Boston with him on a pass which had been given him, he did not pay for her board or hotel bills on that trip. This was certainly most peculiar conduct towards a niece who occupied the foremost place in his affections, and in marked contrast with his demeanor towards Miss Dotterweich, to whom he made frequent and repeated gifts, some of them considerable ones. The undisputed acts of Mr. Frush do not bear out the theory of his deep attachment to his niece. As has been said, Mr. Frush was undoubtedly an eccentric man, and, according to his counsel, Mr. Donaldson, was of a surly disposition and would not in health talk only as it suited him. In view, therefore, of his undisputed acts, and his natural disposition, it is difficult to give entire credence to the theory of a settled purpose to provide for Miss Fanny Frush, as testified to by the witnesses Casey, Smith, Timanus and Williams. That he may have spoken of her as a "fine girl," as testified to by some of the other witnesses, seems very probable, but that is vastly different from a "settled purpose" to provide for her. And this supposed purpose is further negatived by the testimony of Miss Dotterweich, the one individual for whom, from the testimony and his acts, he seemed to have had a genuine affection. The facts are widely different from those which existed in the case of Cherbonnier vs. Evitts et al. (56 Md. 276), with which upon this branch of the case a parallel has been sought to be drawn. I do not, therefore, find any direct evidence, or facts and circumstances, sufficiently strong to lead to the conclusion that in the execution of this deed in question, Luther M. Frush was deprived of his free agency, or that his will was subordinated to that of another.

Was Luther M. Frush mentally incapable of executing a deed on the 8th of July, 1895?

The statute of Maryland prescribes the degree of mental capacity requisite for the execution of a will to be the same as that necessary for the making of a valid deed or contract, but nowhere does it define the requisites for such deed or contract.

Most of the adjudicated cases in regard to mental capacity are with regard to wills; so in this case in considering the question of Mr. Frush's mental capacity the law will be taken to be identical with that governing wills. The sole ground upon which certain cases have sought to distinguish between the degrees of capacity requisite for a will and a deed, the supposed antagonism of minds as between bargainor and bargainee does not exist in this case. Mere inequality of provision, or even the cutting off of a child or relative is not of itself proof of mental incapacity.

"It is not sufficient to avoid a will to show that a testator has left his estate to some children, to the exclusion of others, without any apparently valid reasons for it, as the testator may have had what seemed to him at least suffient reasons, and which are not disclosed by the testimony." Crockett vs. Davis, 81 Md. 148-9. And, "It is not every degree of mental disease or derangement that destroys the legal capacity to dispose of property." See Morgan, 7 Page 237.

Such derangement may vary through an infinite number of degrees from eccentricity or dullness to furious madness or utter imbecility. All that the law requires to make a deed effectual is that a man should have possession of his reason so as to know the effect of the act he is about to perform, and to be capable of carrying it into effect. The question in all cases where incapacity to contract from defect of mind is alleged, is not whether a person's mind is impaired but whether the powers of his mind have been so far affected by his disease as to render him incapable of transacting business like

that in question." Dennett vs. Dennett, 44 N. H. 537.

Where a testator freely understands the nature of the business in which he is engaged, and has sufficient capacity to make a disposition of his estate with judgment and understanding in reference to amount and the situation and the relative claims of different persons who are or who should be the objects of his bounty, the testator is to be considered of disposing mind within the meaning of the statute. Davis vs. Calvert, 5 G. & J. 302; Higgins et al. vs. Carlton, 28 Md. 115; McElwee et al. vs. Ferguson, 43 Md. 484.

The deed was prepared by Mr. Frush's own counsel, who had himself previously suggested the propriety of executing a will, and its execution was before a magistrate of large experience, an officer who had met Mr. Frush before on a number of occasions in the routine of business. Mr. Reardon was therefore more competent to speak as to the mental vigor of Mr. Frush than is ordinarily the case, and he testified in the most positive terms to Mr. Frush's understanding of what he was doing.

Mr. Donaldson's evidence is peculiar. He had prepared the deed not merely upon instructions given him by Mr. Horner, but after a visit made earlier in the day to Mr. Frush. It was his plain duty, as the attorney of Mr. Frush, and as a member of the bar, if he had any doubts whatsoever of the mental competency of his client to have declined to permit the execution of the deed until he had satisfied himself upon that point. What he did was to visit Mr. Frush in the morning, prepare the deed in the afternoon, take the paper and the official before whom it must be executed to the house in the afternoon, read the paper he had prepared or all the material parts of it to the sick man, explain it to him in reply to questions, then having had a conversation with the attending physician, in which he says he expressed his doubts as to Mr. Frush's mental capacity; if he did not himself bring back the deed to the city and place it on record, he made no attempt whatever to interpose any obstacle to that being done. There is no circumstance, therefore, occurring at the time of the execution of the deed to negative the presumption that Mr. Frush was possessed of the requisite capacity. If any of the parties attending upon its execution had any doubt upon this point, it was not manifestedly by their acts, and Mr. Donaldson testifies (340 and 341, cross-questions and answers), that Mr. Frush knew exactly what he was signing.

In inquiries of this character, however, it is always competent to consider the conditions before and after the execution of the instrument attacked, as affording light upon the mental capacity of the individual at the time of the act, because it is generally impossible even in cases of conceded incompetence to fix the exact moment of time when competency ceased and incompetency began.

While always eccentric, it has not been seriously suggested by any witness but what Mr. Frush was in full possession of his mental faculties at the time, that he moved to the Pimlico road on the 8th of June. We have but few glimpses of him between that time and the 6th of July, on which he took to his bed. During this period, he had been up and about, and while at times moody and taciturn, he was not more so than was natural with him in health, if the description of his characteristics is accurate, as given by several of the witnesses. On the 6th of July, he gave attention to two small matters of business, and while not attaching to these the importance that has been claimed for them, the fact that they were permitted to be brought to his attention at all by the inmates of the house, is incompatible with any other theory than that he was regarded by the ladies of the household as mentally competent, however weak he may have been physically. The events of the next day, Sunday, as detailed by the witnesses afford little additional light, though here again it seems strange if his relatives who lived with him, believed him in failing mental as well as physical condition, that they should have permitted the levee almost which seems to have taken place about his bedside, or in the sick room.

Monday morning Mr. Donaldson visits him, finds him in a "comatose" condition, and then and there has a conversation with the sick man in regard to other business matters, as well as the deed of trust. Mr. Donaldson emphasizes Mr. Frush's indisposition to talk,

and then testifies that he was a man who would not in health talk only as it suited him. The very conversation to which Mr. Donaldson testifies shows that Mr. Frush was far from a comatose state, and in this interview there was no wandering or incoherency, or aught that Mr. Donaldson details to show a mind so far affected as to be incapable of understanding what he was doing and the effect of it. Then follows the visit of the afternoon and the execution of the deed; and of the two disinterested persons present, one testifies positively as to his mental capacity, and the other is confident that he knew exactly what he was doing, which is what the law requires.

No reference has been made thus far to any of the medical testimony. Several physicians were examined, but apart from Dr. Bevan all of the medical testimony is unsatisfactory, being predicated for the most part upon various hypotheses or impressions rather than a careful observation of the case. Dr. Crim, it is true, had attended him, but it was not seriously contended in the argument, and hardly can be, that Mr. Frush was incompetent to attend to business at the time fixed by Dr. Crim, or for long after that.

The opinion of an attending physician of repute is and ought to have great weight with courts in the determination of questions of this character, but it cannot always be controlling. Dr. Bevan's testimony with regard to certain facts does not at all times accord with his expressed opinions. Dr. Bevan himself had suggested to Mr. Frush the propriety of arranging his business affairs, and it is hardly possible that at the time of such suggestion he did not regard him as possessed of sufficient capacity. On the day when the deed was executed the Doctor called just after the act had taken place. He describes the condition of Mr. Frush at that time not as a state of collapse, but one of great nervousness and excitement, which he undertook to allay, and with that in view administered for the first time morphia, under the influence of which Mr. Frush dozed off. The agitation of the family at this time, which the Doctor also describes he seems to have dispelled as effectually, for it had so far disappeared that when Mrs. Chew called later in the evening, it made no impression on her and she was taken into the sick room and conversed with Mr. Frush, who in that interview, as testified by her, gave no evidence of being mentally clouded. The chief element upon which Dr. Bevan appears to base his opinion of mental incapacity is a defective memory as to food and medicines taken, but no such defective memory appears in the interview between Mr. Frush and Mr. Donaldson, when the verbal agreement as to the rate of the redemption of the Mason rent is alluded to. Certainly there was no dimming of the mental faculties up to the 8th of July as the result of any drugs prescribed and administered. That is distinctly testified to by the physician, as well as the fact that the first morphia was administered on the evening of that day, and when the Doctor further testifies that Mr. Frush understood perfectly what he had done in the execution of the deed (343 cross answer) it is difficult to see how he reaches the opinion that Mr. Frush lacked sufficient mental capacity for the act.

Of the events following the 8th of July, there is but little occasion to speak. From this date on morphia was administered, and it nowhere appears clearly in the testimony either the quantities of the drug used, or the extent of the influence and effect of the drug upon the patient. But the well-known properties of this powerful remedy are such as to cast a doubt upon any acts done, or statements made by one to whom it is being given. The occurrences of Friday night might well, if they stood alone, cast a doubt upon Mr. Frush's mental capacity, and had the deed been executed upon that day, the court would not have hesitated to set it aside, but Mr. Frush had then, for several days, been having injections of the morphia, and he would have been a phenomenally strong man if he failed to show the effect of them.

I am unable, therefore, from all the testimony, to find that it has been proven that on the 8th day of July, 1895, Luther M. Frush had not a full understanding of the business in which he was engaged, and sufficient capacity to make a disposition of his estate by the deed in question with judgment and understanding.

The bill will, therefore, be dismissed, costs to be paid out of the estate in the hands of the trustee.